**Thomas SIMMONS, Appellant,**

v.

**A.L. LOCKHART, Director, Arkansas Department of Correction, and Steve Clark, Attorney General, State of Arkansas, Appellees.**

No. 86–1177.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 12, 1986.
Decided March 18, 1987.

Ron Heller, Little Rock, Ark., for appellant.

Jack Gillean, Asst. Atty. Gen., Little Rock, Ark., for appellees.

Before McMILLIAN and ARNOLD, Circuit Judges, and ARNOLD,* District Judge.

ARNOLD, Circuit Judge.

This death-penalty case comes to us on appeal of the District Court's [1] denial of habeas corpus relief, 626 F.Supp. 872 (E.D. Ark.1985). On the issues presented to us, we affirm the judgment of the District Court.

## I.

On January 5, 1981, Larry Price disappeared from his home in Fort Smith, Arkansas. On that afternoon, Jawana Price, his wife, went with her employer and landlord, Holly Gentry, to the Fort Smith Police Department to file a missing-person report. Accompanied by Ray Tate, a Fort Smith detective, they returned to the Price apartment. They were never seen alive again. On the next day, the bodies of Tate, Gentry, and Jawana Price were found in rural Crawford County, a few miles from Fort Smith. All had been shot at close range in the back of the head. The following day, the body of Larry Price was discovered at another Crawford County site, about seven miles distant from the first. He, too, had been shot in the back of the head.

The only firm lead which the police uncovered was that Thomas Simmons, the

---

* The Hon. Morris S. Arnold, United States District Judge for the Western District of Arkansas, sitting by designation.

1. The Hon. Henry Woods, United States District Judge for the Eastern District of Arkansas.

present petitioner, had deposited into his bank account on January 5 a check drawn on a closed account of Larry and Jawana Price. On January 6, Simmons went to the bank and sought to retrieve the check. An alert teller noticed that the name "Larry Price" was the same as that of the person reported as missing, and promptly notified the police. Simmons was taken into custody at his workplace and eventually was charged with four counts of capital murder.

At trial the State relied primarily on circumstantial evidence. The physical evidence in the case was not conclusive of Simmons's guilt. Although numerous fingerprints were taken from the Price apartment and the Tate car, none of them matched to Simmons. Some forensic evidence was consistent with (but not conclusive of) Simmons's guilt, while some was inconsistent with the State's theory. Circumstantial evidence in the case included testimony which placed Simmons at or near the Price apartment during the day of the murders and testimony that he was seen watching Jawana Price's car at her place of employment late that afternoon. One witness for the State testified that he had observed two bound men and a woman being taken from the Price apartment during the evening of January 5 and forced into a car resembling Detective Tate's unmarked car by a man whom the witness identified as Simmons. Although the witness testified that he was unconcerned at the time, he later came forward and made a statement to the police.

On August 19, 1981, the jury found Simmons guilty of four counts of capital murder. The jury then fixed punishment at death on all counts.

The Arkansas Supreme Court affirmed the conviction and sentence, *Simmons v. State*, 278 Ark. 305, 645 S.W.2d 680 (Smith,

J.), *cert. denied*, 464 U.S. 865, 104 S.Ct. 197, 78 L.Ed.2d 173 (1983). When the Arkansas Supreme Court refused to stay his execution pending the filing of a petition for post-conviction relief, 280 Ark. 542, 659 S.W.2d 758 (1983) (per curiam), Simmons commenced this action in the District Court, which did issue a stay.

## II.

Although Simmons raised seven grounds in support of his petition in the District Court, only four of them are before us now.[2]

### A.

Simmons's trial counsel moved for a change of venue to a county outside the 12th Judicial Circuit. This Circuit contains two counties: Sebastian (in which the abductions had taken place), a predominantly urban county with seats at the City of Fort Smith and the Town of Greenwood; and Crawford (in which the murders were charged to have occurred), a mainly rural county with its seat at Van Buren, approximately five miles from Fort Smith. Simmons argued that since crimes were alleged to have occurred in both counties, and since news reporting from the Fort Smith metropolitan area blankets the entire circuit, a change of venue from Crawford County to Sebastian County would be meaningless. The trial court, after hearing testimony and argument which cover over 500 pages of the trial record, ruled that under the Constitution and statutes of Arkansas, it had no power to transfer the venue of a criminal proceeding from the judicial district or circuit in which the charges had been filed. In the alternative, the court ruled that even if it had the authority to grant such a motion, the evidence did not support a conclusion that the pretrial publicity had been so overwhelm-

---

**2.** Three grounds for the petitioner's relief, decided adversely to him by the District Court, have not been appealed to us: (1) the argument that the Arkansas capital-murder statute (Ark.Stat. Ann. § 41–1501(1)(a)) is unconstitutionally vague since it overlaps the first-degree murder statute (Ark.Stat.Ann. § 41–1502(1)(a)); (2) a Fourth Amendment challenge to the circum-stances of the petitioner's arrest and to subsequent seizures of evidence which are alleged to have been tainted by the faulty arrest; and (3) a challenge to the sufficiency of the evidence. Since these points have not been preserved for review, we express no opinion as to their significance.

ing and prejudicial as to deny the defendant a fair trial in Crawford County. Tr. 1577–79. The motion was therefore denied.

The trial court relied in part on the Constitution of Arkansas, Art. 2, § 10, which reads as follows:

§ 10. *Rights of accused enumerated— Change of venue.*—In all criminal prosecutions the accused shall enjoy the right to a speedy and public trial by impartial jury of the county in which the crime shall have been committed; provided that the venue may be changed to any other county of the judicial district in which the indictment is found, upon the application of the accused, in such manner as now is, or may be, prescribed by law; and to be informed of the nature and cause of the accusation against him, and to have a copy thereof; and to be confronted with the witnesses against him; to have compulsory process for obtaining witness in his favor, and to be heard by himself and his counsel.

Although in the early days there were cases in which this section was construed as an absolute bar to any change of venue outside the district, see, *e.g., State v. Flynn,* 31 Ark. 35 (1876), the Arkansas Supreme Court has more recently sought to interpret the limiting clause of the section in favor of the right of the accused to trial by an unbiased jury. In *Cockrell v. Dobbs,* 238 Ark. 348, 381 S.W.2d 756 (1964), the Court stated that:

The important declaration in this section of the constitution is its guaranty of a trial by an impartial jury. A change of venue is a means to that end. The subordinate directive that it be to another county in the district is also for the protection of the accused, for it prevents the trial from taking place at an unreasonable distance from the county where the offense was committed.

*Id.* at 350, 381 S.W.2d at 757. In *Cockrell,* the defendant was being tried in a single-county judicial circuit. It had been shown that he could not receive a fair trial in that county. The Court therefore ordered a change of venue to another circuit, despite the apparent limitation in Section 10, so as

not to violate the core of that section, which is the guarantee of an impartial jury. See also *Swindler v. State,* 264 Ark. 107, 569 S.W.2d 120 (1978), in which a capital-murder conviction was reversed because of intense and prejudicial pretrial publicity in the local area. Upon remand, venue was transferred out of the Twelfth Circuit (which at that time contained only Sebastian County) to an adjacent county in another circuit. *Swindler v. State,* 267 Ark. 418, 592 S.W.2d 91 (1979), *cert. denied,* 449 U.S. 1057, 101 S.Ct. 630, 66 L.Ed.2d 511 (1980).

Subsequently, the Arkansas Supreme Court has ruled, in two other spectacular Crawford County capital-murder cases, that if prejudicial pretrial publicity has made a fair trial impossible in any of the counties in the judicial circuit, then the venue must be moved outside the circuit. *Compare Perry v. State,* 277 Ark. 357, 642 S.W.2d 865 (1982) ("The court could have granted a change of venue to any county adjacent to Crawford County, either inside or outside of the Twelfth Judicial District," *id.* at 363, 642 S.W.2d at 868, citing *Cockrell, supra* ), *with Anderson v. State,* 278 Ark. 171, 644 S.W.2d 278 (1983) ("[I]f the trial court determines a defendant cannot receive a fair trial, then it has the power to remove the case to some county in an adjoining judicial circuit," *id.* at 178, 644 S.W.2d at 281.). The *Anderson* Court stated that "[i]f the question is whether a defendant can or cannot receive a fair trial, as required by the fourteenth amendment to the United States Constitution, then conflicting law must give way to a defendant's right to due process." *Id.* at 177–78, 644 S.W.2d at 281 (footnote omitted). The Arkansas Supreme Court has striven to limit the strict language of Section 10 so that it would be consistent with the Sixth and Fourteenth Amendments of the federal Constitution. If, in the instant case, the trial court had relied solely on a strict reading of Section 10 without looking to whether the defendant could receive a fair trial in the local area, then it would have committed reversible error.

However, the trial court gave, as its alternative reason for denying the motion, its conclusion that "I do not believe that the publicity concerning this case has been so overwhelming and prejudicial that the defendant could not receive a fair trial in Crawford County." Tr. 1578–79. This is an essentially factual conclusion by the State trial court. It is entitled to a presumption of correctness in federal habeas corpus proceedings unless the State court hearing was procedurally defective, see 28 U.S.C. § 2254(d)(1)–(7), or unless the federal court, upon considering the record as a whole, concludes that the factual determination was not fairly supported by the record. 28 U.S.C. § 2254(d)(8).

In the hearing on the change-of-venue motion, Simmons offered abundant evidence of the extent and tone of pretrial publicity. The murder of four people including a police officer would be a major news event in any community. But in the Fort Smith-Van Buren area, the story was a sensation; it was described by the media as "the worst act of violence here in a long long time" (KFSM–TV, tr. 1085), "one of the most horrible crimes in Fort Smith history" (KFSM–TV, tr. 1146), and [incorrectly] as "the largest mass murder in Arkansas history," (KFPW–TV, tr. 1357). The Simmons case came on the heels of an unconnected series of murders in the immediate area. At the time of the venue hearing, four separate capital-murder trials were pending in Fort Smith or Van Buren (tr. 1366–67). Local citizens were appalled by what appeared to be a reign of violence unprecedented in this century and the news media reflected their concern. KFPW–TV in an editorial comment on January 7 worried that "this ... most recent in a series of violent killings ... [has raised] concern about the quality of life in Western Arkansas." Tr. 1343. Citizen comment, aired in "man-on-the-street" interviews, was less restrained. A gun dealer, whose business had increased substantially since the recent series of murders, stated that enforcement of the death penalty is the only "way to stop violent crime and make the streets safe again." KFSM–TV, tr. 1125. A "people poll" aired January 9th on KLMN–TV

elicited these comments: " '[we] ought to have more capital punishment ...,' '... not enough murders [are being] solved ...,' 'something should be done about keeping these people in prison ...,' and '... judges are too lenient....' " Tr. 1241. A Fort Smith Police Department major who was involved in the Simmons investigation was quoted by a state-wide newspaper as saying: " 'We've lost two police officers in the past four years.... If we don't get something done and kill some of the people for killing others the whole society is doomed. It was a tragic, senseless, execution-style killing by a very ruthless individual who had been serving time.' " *Arkansas Democrat*, January 9, 1981, tr. 1487.

Immediately upon Simmons's arrest on January 6, the news reported extensively his record of prior convictions. See, *e.g.*, *Arkansas Gazette* articles of January 7–9, which described his "extensive criminal record," including a 1960 juvenile arrest for larceny, a bad-conduct discharge from the Air Force in 1961, and subsequent convictions for forgery, larceny, kidnapping, and assault. Tr. 1433–36. The fact that the accused was a recent federal parolee was emphasized in virtually every medium. See, *e.g.*, KFSM–TV, January 7, tr. 1100; KFPW–TV, January 6, tr. 1342; KAYR radio, January 8, tr. 1173; KTCS radio, January 8, tr. 1262; KFPW radio, January 7, tr. 1315; KFSA radio, January 8, tr. 1398; KTHV–TV, January 8, tr. 1478. Several media sources remarked on the parallels between this case and the 1977 murder of Fort Smith policeman Randy Basnett, who was killed by a former federal inmate about a week after the inmate's release from prison on parole. This was a particular sore spot with local citizens who felt that the parole system was not effective. The views of police officials, prosecutors, and others were prominently aired. See, *e.g.*, KFSM–TV, April 10, tr. 1130 (report of the comments of the Fort Smith Chief of Police) " 'the state is handing out paroles right and left' "; KTCS radio, January 8, tr. 1262, 1263 (comments of a former prosecutor); and KARK–TV, January 9, tr. 1522 ("citizens in Fort Smith are crying for the

death penalty and tougher parole requirements").

Factual reporting of the developments in the case, however, was generally vigorous and professional. Most references to Simmons in news reports were careful to describe him as "alleged" or "accused" murderer. When one radio station reported that "Simmons has not confessed any motive" (tr. 1390), it quickly aired a retraction to abate the impression that there was a confession of any kind. Tr. 1394. When the Fort Smith Chief of Police told a meeting of a local civic organization that Simmons was guilty, the leading local television outlet took care to edit his prejudicial comments out of its report. Tr. 1130, 1499–1501. A local radio news director stated that he aired between thirty and forty listener calls about the murders on his morning talk show, but took care to pre-screen the calls so as to avoid those of the "string-him-up variety." Tr. 1163–66.

A thorough review of the publicity evidence confirms the conclusion of the District Court that the great bulk of news reporting on the Simmons case was concentrated in the first two weeks after the murders. Thereafter, there were sporadic reports of specific events, such as motions filed. The week of preliminary hearings (in early May) was thoroughly reported, but the emphasis was on the court proceedings on motions, rather than on Simmons himself.

The defense offered eight affidavits from Crawford County residents and the testimony of five witnesses (from both counties) expressing the view that Simmons could not receive a fair trial in the local area. Several of these witnesses felt that although jurors would want to keep an open mind, it would be impossible for them to set aside their "gut feeling," fostered by the intense local publicity, that Simmons's guilt was a foregone conclusion. See, *e.g.,* testimony of Naif Khoury, tr. 1038–42. One witness whose acquaintances' minds were made up on the issue of Simmons's guilt stated that local people were particularly incensed because this murder case was the latest in a series of recent murders, and

that when Simmons was arrested less than twenty-four hours after the murders, the collective sense of outrage settled immediately on him. See tr. 1056–57, 1059.

The state offered affidavits from fifteen Crawford County residents who were of the opinion that despite the general notoriety of this case, it would be possible to find an unbiased jury.

As we noted earlier, the trial court concluded that the pretrial publicity had not been so extensive and slanted as to deny Simmons the opportunity for a trial by unbiased jury. We have not been shown that this conclusion was wrong. It is true that the initial publicity, which was massive, included elements that tended to suggest that the accused's guilt was a foregone conclusion. For instance, the fact of a prior criminal record was widely noted and commented upon; the news reported on lineup identification by witnesses, the taking of evidence for laboratory analysis and comparison, and the lengthy interrogation of Simmons by the police and his refusal to confess. It was reported that the police were pleased that they had "solved" the crime within twenty-four hours, and that there was widespread relief that a suspect was in custody. This is the sort of publicity that the Arkansas Supreme Court has said can be most adverse to the accused's right to trial by an impartial tribunal, since it can plant the idea in the public mind that the police have in fact determined the accused's guilt and that the trial, when it occurs, will merely be a formality before sentencing. See *Swindler v. State,* 264 Ark. 107, 125, 569 S.W.2d 120, 129–30 (1978) (Harris, C.J., concurring). But the fact that potentially prejudicial material was published does not conclusively demonstrate that a fair trial is impossible in the local area. The press has a duty to report matters of legitimate public interest, and surely the facts reported in this case fall into that category. Citizens are understandably concerned over the possibility that a former offender may have committed another crime after serving his term, and the press is entitled to inform the public of this possibility even though there may be some danger that the accused's

chances for trial by an unbiased jury may thereby be diminished. A change of venue is the available mechanism for protecting the accused's fundamental right to fair trial when the press's exercise of its own fundamental right of reporting the news has irretrievably determined public opinion against the accused.

In order to conclude whether Simmons's right to a fair trial was prejudiced by the pretrial publicity, it is necessary to determine the actual effect of the publicity on the venire panel from which his jury was selected, and on the jury itself. We note at the outset, as did the State courts and the District Court, that the bulk of reporting in the Simmons case occurred in the two weeks immediately following the January 5 murders. There was a lull between that time and the preliminary hearings in May, then an almost complete lapse in reporting until selection of the jury began on August 5, 1981. Seven months is not long enough to allow complete forgetfulness of such a major event as this, but it may be long enough to allow the initial heat and hostility to dissipate, particularly when the local press had not kept the story in the forefront of public attention. For comparison, consider the celebrated case of *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), in which a steady drumbeat of highly damaging publicity continued without relief for the three months between the crime and the defendant's trial. There, the news media not only orchestrated public denunciation of the accused, but were allowed to interfere in the trial itself, see 384 U.S. at 342–45, 86 S.Ct. at 1511–13. Nothing of the sort occurred here.

Fifty-six persons were examined by counsel before Simmons's jury was selected. Of the 56, all but one had heard of the case from news reports. However, the fact that a venire panel is well informed on reported news is not by itself prejudicial. The accused is not entitled to an ignorant jury, just a fair one. See *Irvin v. Dowd*, 366 U.S. 717, 722–23, 81 S.Ct. 1639, 1642–43, 6 L.Ed.2d 751 (1961). Of more significance is the degree to which prior knowledge of the events may have led potential jurors to form a conclusion as to the merits of the State's case against the accused. In this regard, only fourteen members of the venire in this case (25%) indicated that they had formed a personal opinion that he was guilty. Of these, several said that they were able to set aside what they had heard and decide the case strictly on the evidence produced at trial. Nine of the opinionated panel members were excused for cause; one was peremptorily excused by the defense after a motion for cause was denied; two were excused by the defense without a prior motion for cause; one was excused by the state; only one (juror # 9) was seated. Under thorough examination by the defense, he stated that he could set aside what he had heard and that he would not expect the defendant to prove his innocence. This juror was seated without challenge and was pronounced good by both sides. Only eight of the 56 potential jurors recalled hearing that Simmons had a prior prison record. Two of these were excused for cause because they could not hold the state to its burden; two were excused by the state and two by the defense on peremptory challenges. Two (jurors # 2 and # 7) were seated without challenge after assuring the court that they had formed no opinion as to Simmons's guilt and would not hold against him the fact that he had served time in prison. Both were pronounced good by both sides. Careful analysis of the voir dire of the jury panel belies the proposition that the pretrial publicity in this case had so corrupted the local attitude toward the defendant that he could not be fairly tried.[3]

---

3. Other possible sources of bias against the defendant were thoroughly tested during voir dire. Nineteen venire members indicated some difficulty with the burden of proof in a criminal case. While some of these persons had to some degree formed their own opinions of Simmons's guilt, others simply misunderstood the allocation of burdens and thought that the fact of a criminal charge stood as some evidence of guilt that would have to be overcome by the defendant. Of these nineteen, thirteen were excused for cause; five were excused on peremptories; one (juror # 11) was seated on the jury. During questioning by defense counsel he had initially

This case is not one in which the pretrial publicity was so pervasive and unrelenting as to make the jurors' claims of impartiality unbelievable. See *Graham v. Mabry*, 645 F.2d 603, 608–12 (8th Cir.1981). In such a case, a "pattern of deep and bitter prejudice" against the defendant, engendered by vicious and sensational reporting, is so evident in the attitudes of the venire that even the few jurors who claim to be able to disregard what they have heard must be presumed to have been irretrievably poisoned by the publicity. *Irvin v. Dowd*, 366 U.S. 717, 727–28, 81 S.Ct. 1639, 1645–46, 6 L.Ed.2d 751 (1961). But *Irvin* does not authorize wholesale second-guessing of state trial-court conclusions by the federal courts. A state finding of the impartiality of the jury as a whole is to be overturned only if, upon an examination of the whole record, the federal court is convinced that error is manifest. *Id.* at 723–24, 81 S.Ct. at 1642–43. In *Irvin*, the massive publicity was reflected in the responses of 86% of the venire of 430 persons whose minds were made up as to the guilt of the defendant (compared to 25% of a venire of 56 in the present case.) In *Irvin*, the jury included eight members who had preconceived opinions of guilt. The defense had challenged each member for cause and had been overruled. The Supreme Court held that under the influence of the overwhelming sense of the defendant's guilt which had been fostered by pretrial publicity, it would be impossible for the jury to overcome that prejudice, regardless of its good intentions. Here, though, only one seated juror was initially found to

entertain a preconceived sense of Simmons's guilt. Upon assuring the court that he could disregard that opinion, he was approved by the defense.

Without evidence of the *Irvin* type that the entire jury was permeated with bias, we are left with, at most, the possibility that a single juror retained his prior bias. However, the case of *Patton v. Yount*, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984), reminds us that the question of possible bias in a single juror is a pure matter of fact to be reviewed under the deferent standard of 28 U.S.C. § 2254(d). Since identifying bias in an individual juror is as much a matter of assessing demeanor as it is of analyzing the answers which the juror gives to questions, see *Reynolds v. United States*, 98 U.S. (8 Otto) 145, 156–57, 25 L.Ed. 244 (1878), the findings of the trial court are entitled to particular deference. See *Patton*, 467 U.S. at 1038 and n. 14, 104 S.Ct. at 2892 and n. 14. We are not convinced that there was any error in the trial court's rulings.

Most significantly, Simmons and his attorneys pronounced each juror to be "good for the defense." With the single exception mentioned earlier, none of these jurors was challenged for cause at any point in the proceedings. Unlike the situation in *Irvin*, the defendant here did not have a hostile jury forced upon him. To the contrary, he approved each member. Thus, even if we found error in the trial court's rulings as to pretrial publicity and selection of the jury, we would be unable to find prejudice, because the defendant was tried

---

said that he would expect the defendant to put on some kind of case regardless of the depth of the State's case. At this point the defense moved to excuse him for cause. Upon further questioning, however, he stated that he understood that the state had the burden of proof, and that although he would like to hear what the defendant had to say, he would not hold it against Simmons if he were to choose not to testify. The defense did not renew its motion for cause and did not take a peremptory strike. The juror was pronounced good by both sides.

Fifteen members of the panel initially exhibited absolute opinions in favor of applying the death penalty. These attitudes ranged from a few who were unalterably predisposed to vote the death penalty in all of certain classes of

cases to some who did not at first realize that the jury had a choice between the death penalty and a life-without-parole sentence. Of the latter, several were rehabilitated after further questioning and indicated that they could consider both alternatives. In all, seven of the venire members favoring an automatic death penalty were excused for cause; six were struck by the defense; and two were seated without challenge after they stated a willingness to consider both penalties before passing judgment. They (jurors # 4 and # 9) were pronounced good by both sides.

Ten persons had been acquainted with victims or their families. None of them served on the jury.

by a jury which, at the time of trial, he found to be acceptable, and whose members were in fact impartial.

### B.

■ The petitioner's second point for reversal concerns the failure of the trial court to excuse for cause three jurors who, during voir dire, expressed views which, he contends, revealed bias toward him. Consequently, he used three peremptory challenges in order to remove these individuals from the jury. He ultimately exhausted his peremptory challenges immediately before the final juror was seated.

The District Court reviewed the record, as have we, and determined that the trial court's decision not to excuse these members was fairly supported in the record. *Simmons v. Lockhart*, 626 F.Supp. 872, 877 (E.D.Ark.1985). We agree with the District Court, noting that the trial court was in a better position than are we to observe the total demeanor and attitude of the panel members. *Patton, supra,* 467 U.S. at 1038 and n. 14, 104 S.Ct. at 2892 and n. 14. As with the venue issue which we discussed in more detail above, here Simmons has not shown how, if at all, he was hurt by the error which he alleges. None of the disputed panel members was seated on the jury; after he exhausted his peremptory challenges, he accepted the very next juror as # 12, raising no objection of any kind; and furthermore, every member of the jury was pronounced good by Simmons's attorneys.

### C.

■ Petitioner alleges that his right to a fair trial was violated when the state failed to reveal to him the identity of the person who found the fourth body (that of Larry Price) on January 7, 1981. News releases from the Crawford County Sheriff's Department and the State's evidence at trial indicated that Sheriff's Deputy Bill Grill had received a telephone call from an unknown informant stating that either a body or a mannequin was located at Clear Creek Park. During the discovery process prior to trial, Deputy Grill had repeatedly told both defense counsel and the prosecutor that he did not know who the caller had been. Near the end of the defense case on August 18, 1981, Deputy Grill testified for the defense and for the first time revealed the name of his informant. Tr. 3590. He testified that he had withheld the name of this person because the man, whom he knew, had requested anonymity and because he, Grill, was certain that the man had nothing to do with the crime. Tr. 3593–3604. At this point in the trial, the defense moved for a mistrial on the ground that its ability to prepare an adequate defense had been thwarted by the withholding of evidence by an agent of the state. The motion for mistrial was denied. The defense did not move for a continuance so that the missing witness could be found.

The District Court held a hearing on September 3, 1985, at which testimony was taken from the prosecuting attorney and from Simmons's trial counsel. The prosecutor testified that disclosure of the name of the witness at trial had been as much a surprise to the State as it had been to the defense. D.Ct. tr. 28–29. The prosecutor also testified to his "open files" policy whereby all material (other than legal research) was made available to the defense. In addition, defense counsel said that he had filed a routine discovery motion, D.Ct. tr. 7, but that no attempt had been made to depose Deputy Grill specifically as to the identity of his informant. D.Ct. tr. 15. Defense counsel additionally testified that had he known who had discovered the body, he "might have decided to call them as witnesses depending on what information they had given us." D.Ct. tr. 13. But apart from the possibility that this testimony might have proven useful to the defense, there was no suggestion that it was or might have been actually material to the issue of Simmons's guilt or innocence. The District Court held that since the evidence did not create a reasonable doubt as to the petitioner's guilt, there was no error sufficient to require granting of the writ.

It is clear that this incident had no practical effect on the defense of this case. There is no reason to suppose that the

defense would have been any different if the identity of the informant had been revealed earlier. We are far from able to say that this omission undermines our confidence in the verdict, in the sense that a different verdict would have been reasonably likely, and that is the legal standard petitioner must meet. There has been no suggestion that the person discovering the body was other than a passerby who stumbled across a body and promptly reported that fact to the authorities. The petitioner has provided us with no reason other than rank speculation which would persuade us otherwise. See *Richards v. Solem,* 693 F.2d 760, 765 (8th Cir.1982), *cert. denied,* 461 U.S. 916, 103 S.Ct. 1898, 77 L.Ed.2d 286 (1983).

## D.

■ The petitioner's final ground for appeal is insubstantial. After the jury had decided Simmons's guilt, they heard arguments by both sides on the aggravating and mitigating circumstances which might affect the choice of punishment. The Court extensively instructed the jury on the law and provided them with special verdict forms on which they were to identify any aggravating or mitigating circumstances which they found. When the verdict was returned, the jury had voted the death penalty on all four counts. All members of the panel had found that Simmons's prior record of violent crime was an aggravating circumstance. The special jury forms as to victims Tate, Gentry, and Jawana Price indicated that some, but not all, of the members of the jury had found as a mitigating circumstance "fear of detection." Tr. 3859. No other mitigating or aggravating circumstances were found by any member of the jury. Finally, the jury unanimously agreed that the aggravating circumstance outweighed beyond a reasonable doubt any mitigating circumstances and that the death penalty was justified beyond a reasonable doubt.

Under Arkansas law, aggravating circumstances which the jury may consider are strictly limited to the ones enumerated in Ark.Stat.Ann. § 41–1303. They include the aggravating circumstance of a prior violent felony, which this jury unanimously found; they do not include "fear of detection." Mitigating circumstances, on the other hand, are not limited to the several mentioned in the statute; the jury may take into account any circumstance which it considers to mitigate the seriousness of the crime. See Ark.Stat.Ann. § 41–1304.

The petitioner argues that the words "fear of detection" can represent only an aggravating circumstance. As the argument goes, Simmons's fear of detection of the murder of Larry Price resulted in the murder of three additional victims and therefore must have been viewed in the minds of the jury as an aggravating factor. If that is so, then the jury erred by considering an aggravating circumstance not mentioned in Ark.Stat.Ann. § 41–1303.

This argument is unavailing for two reasons. First, the jury in fact inserted the words "fear of detection" in the space provided on the special verdict form for other mitigating circumstances; under aggravating circumstances, the jury listed only the one which was appropriate under the statute, *i.e.,* a prior violent felony. In order to find error here, we would have to speculate that the jury either disregarded or misunderstood both the court's oral instructions and its written instructions, which the jury had with them during the deliberations, and further that the jury disregarded or misunderstood the special verdict form, which on its face is an unambiguous outline of the required process of deliberation. That is too much speculation for us to indulge in when there is no evidence of a misunderstanding on the part of the jury (other than the petitioner's semantic argument). At the request of the defense, the jury members were individually polled, and all members agreed that the verdict was theirs. Tr. 3860–63.

A second reason why we cannot accept the petitioner's argument is that it presumes that the jury's understanding of the words "fear of detection" is the same as the one suggested by the defense, and that this is the only rational meaning which can be ascribed to those words. But, as the

Arkansas Supreme Court pointed out when it reviewed this question on direct appeal, the words must be interpreted as the jury *could have* understood them. *Simmons v. State*, 278 Ark. 305, 319, 645 S.W.2d 680, 688, *cert. denied*, 464 U.S. 865, 104 S.Ct. 197, 78 L.Ed.2d 173 (1983). The Arkansas Court pointed out that the jury could have viewed the murderer's fear of detection as a mitigating circumstance as to the killing of the last three victims in that it at least provided an understandable, although twisted, motive, and therefore mitigated the coldbloodedness of those crimes. *Ibid.* Such a hypothesis is rational; it is believable. We will not second-guess the verdict of a jury, rational on its face, on such a slender showing as has been offered here.

### III.

For all the reasons which we have discussed above, we must affirm the order of the District Court denying Thomas Simmons's petition for habeas corpus. Having held the balance of the law true between Simmons and the State of Arkansas, and applying the law as it now exists to the facts in the record before us, we are unable to say that there is any federal constitutional infirmity in Simmons's conviction.

We direct that our mandate be stayed pending the filing and disposition of a timely petition for rehearing, with or without suggestions for rehearing en banc, and the filing and disposition of a timely petition for writ of certiorari in the Supreme Court of the United States.