John Edward SWINDLER, Plaintiff,

v.

A.L. LOCKHART, Director, Arkansas
Department of Correction,
Respondent.

No. PB–C–81–415.

United States District Court,
E.D. Arkansas,
Pine Bluff Division.

Aug. 12, 1988.

Thurman Ragar, Van Buren, Ark., for plaintiff.

Jack Gillean, Asst. Atty. Gen., Little Rock, Ark., for respondent.

## MEMORANDUM OPINION

HENRY WOODS, District Judge.

Petitioner John Edward Swindler was convicted of the capital felony murder of Randy Basnett, a Ft. Smith police officer, and was sentenced to death by the Circuit Court of Sebastian County, Arkansas. The Supreme Court of Arkansas set aside that conviction and granted Swindler a new trial because the trial court had erroneously refused to grant the defense motion for a change of venue from Sebastian County, the situs of Officer Basnett's killing. *Swindler v. State*, 264 Ark. 107, 569 S.W. 2d 120 (1978).

Swindler was retried in Scott County, Arkansas, which adjoins Sebastian County to the South. The Circuit Court of Scott County found Swindler guilty of capital felony murder and sentenced him to death. This second conviction and death sentence have been appealed and affirmed by the Supreme Court of Arkansas, 267 Ark. 418, 592 S.W.2d 91 (1979), *cert. denied, Swindler v. Arkansas*, 449 U.S. 1057, 101 S.Ct. 630, 66 L.Ed.2d 511 (1980). Subsequently, Swindler filed for post-conviction relief pursuant to Rule 37 of the Arkansas Rules of Criminal Procedure. The petition was denied by the Supreme Court of Arkansas, *Swindler v. State*, 272 Ark. 340, 617 S.W. 2d 1 (1981), *cert. denied*, 454 U.S. 933, 102 S.Ct. 431, 70 L.Ed.2d 240 (1981). Thus, post-conviction remedies available through the courts of the State of Arkansas have been exhausted.

Petitioner seeks relief from the Scott County conviction and death sentence and has filed for a writ of habeas corpus pursuant to 28 U.S.C. §§ 2242 and 2254. He asserts six (6) grounds for relief[1]: (1) a venireman was excluded after he voiced only general objections to the death penalty; (2) Ark.Stat.Ann. § 43–1507[2] was unconstitutionally applied to him when he was denied a second change of venue; (3) jurors biased against the petitioner were selected after the defense had exhausted its peremptory challenges; (4) the trial court erred in refusing to grant a continuance in the penalty phase of his bifurcated trial so that the defense could present a witness to testify in his behalf; (5) Ark.Stat.Ann. § 41–1303(4)[3] was unconstitutionally applied to petitioner when an impermissible "aggravating circumstance" was considered by the jury in the penalty phase of his trial; and (6) petitioner was denied effective assistance of counsel at trial.

## I.

■ Four veniremen were excused after voicing objection to the death penalty. The petitioner challenges the exclusion of one of the four, Murl Carmak, on grounds that Carmack expressed only general objections to the death penalty.

Exclusion of a juror on the basis of objection to the death penalty is appropriate when that juror's views "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985) (quoting *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)).

The trial court excused Mr. Carmack after a series of questions posed to Mr. Carmack by counsel and the court revealed opposition to the death penalty. Several of those questions indicate that Mr. Carmack was properly excused for cause:

Q. I understand you might not want to [impose the death penalty], but you know it is the law of Arkansas, and if you listened to the evidence and you found that under our law this was a proper case for the death penalty, then could you follow Arkansas law, or would you stick to your own personal feelings?

A. Well, now I would stick to what I believe in.

Q. So are you telling me that no matter what the facts are, or what the law is, that you would not vote for the death penalty?

A. No, I don't think I would.

Q. Okay, now you say you don't think you would. Can you tell me for sure that you would or would not?

A. Well, I wouldn't then, I will put it that way.

Q. No matter what the facts were, or what the law was, you would not vote for the death penalty?

A. No, I don't believe I could, and then have a clear conscience.

. . . .

THE COURT: Now what he has asked you is, and I want to ask you, too, to be sure that I understand. Is that feeling that you have or your belief so fixed and strong that regardless of what the facts might be, regardless of how bad they might be, or how aggravating they might be, in any case, that under no circumstances could you consider imposing the death penalty?

A. I wouldn't.

THE COURT: In any case?

A. I don't believe I would.

(Tr. 1447–48).

This court is obligated to presume the correctness of the trial court's findings of fact. 28 U.S.C. § 2254(d). The United

---

1. Petitioner originally asserted nine (9) grounds for relief, but proceeded with only seven at the *habeas* hearing. He now concedes that the claim that the "death qualifying" of the jury violated his sixth amendment right must fail in light of *Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986).

2. The Arkansas venue statute is now found at Ark.Code Ann. § 16–88–207.

3. The statute is currently found at Ark.Code Ann. § 5–4–604(4).

States Supreme Court has held that the trial court's decision to excuse prospective jurors due to their opposition to the death penalty is primarily a factual determination, thus subject to a presumption of correctness under § 2254(d). *Wainwright v. Witt, supra.* The trial court is best suited to judge the issue of bias since "such a finding is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province." *Id.* 469 U.S. at 428, 105 S.Ct. at 854.

In this case the trial court's findings must be sustained. Venireman Carmack plainly said that under no circumstances would he vote to impose the death penalty. Mr. Carmack was properly excused.

## II.

■ The petitioner next argues that his sixth amendment right to be tried by an impartial jury was abridged when the trial court denied a motion for a change of venue. After Swindler's first conviction, the Supreme Court of Arkansas reversed and granted a new trial because the trial judge had refused to grant the defense motion for a change of venue from Sebastian County, where Swindler had shot and killed a Ft. Smith police officer. *Swindler, supra.* On remand, the trial was conducted in Scott County, which is adjacent to Sebastian County.

Swindler contends that he was entitled to a change of venue in the second trial because prejudicial pre-trial publicity in Scott County was indistinguishable from that in Sebastian County. Swindler further contends that he was denied a change of venue from Scott County because of an unconstitutional Arkansas statute[4] which purports to limit a criminal defendant to one change of venue. The argument is without merit and is unsupported by the record.

The question of whether to grant a change of venue rests squarely in the discretion of the trial court. *Johnson v. Nix,* 763 F.2d 344 (8th Cir.1985). The trial judge had the opportunity to evaluate the tenor of the voir dire and to observe and assess each prospective juror's demeanor in conjunction with his or her answers to questions. Thus, the trial judge was uniquely qualified to determine whether a change of venue was required in order to assure that the defendant received a fair trial. It is settled law that the trial court's findings of impartiality can be overturned only for "manifest error." *Patton v. Yount,* 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984), *quoting Irvin v. Dowd,* 366 U.S. 717 at 723, 81 S.Ct. 1639 at 1643, 6 L.Ed.2d 751. In other words, this court must accord the state court findings of fact a "high measure of deference," *Sumner v. Mata,* 455 U.S. 591, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982), and may not set them aside unless it is reasonable to conclude that those findings "lacked even 'fair support' in the record." *Johnson,* 763 F.2d 344 at 345, *quoting Marshall v. Lonberger,* 459 U.S. 422, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983).

■ The question of prejudicial pre-trial publicity requires a two-prong inquiry: First, what was the nature and extent of the pre-trial publicity; and second, what was the effect of the pre-trial publicity on the venire panel from which the jury was selected, and on the jury itself. *See Simmons v. Lockhart,* 814 F.2d 504 (8th Cir. 1987). Widespread or even adverse publicity is not, in and of itself, grounds for a venue change. *Johnson, supra.* This court must determine from the totality of the circumstances, whether the trial court committed manifest error in failing to hold that adverse pre-trial publicity had created such a presumption of prejudice in the community that jurors' claims that they can be impartial should be disbelieved. *Yount, supra.*

The only evidence of the extent of pre-trial publicity in this case is the transcript of the voir dire of the prospective jurors. In a voir dire that lasted five days, 120 veniremen were examined; 79 were excused for cause.

It is clearly established law that the number of jurors excused for cause, standing alone, does not entitle a defendant to a change of venue. *See Yount, supra.*

4. Ark.Code Ann. § 16-88-207.

There is no "magic number" excused for cause that triggers the presumption that there exists within the community a "pattern of deep and bitter prejudice" against the defendant so evident that the entire panel must be presumed to have been "irretrievably poisoned by the publicity." *Simmons, supra*, 814 F.2d at 511, *quoting Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).[5] The Supreme Court carefully distinguished between knowledge of and feelings about the case: "It is not unusual that one's recollection of the fact that a notorious crime was committed lingers long after the feelings of revulsion that create prejudice have passed." *Yount*, 467 U.S. at 1035, 104 S.Ct. at 2891.

Of the 79 veniremen excused for cause in the pending case, many were excused because of an inability to accept philosophically the legal concepts of "presumption of innocence" and "burden of proof." *See, e.g.* the statements of the following: Venireman # 4, May (no evidence of exposure to pre-trial publicity, but did not answer that defendant, prior to trial, is innocent) (TR 725); Veniremen # 14, Stinson, and # 3, Owen, (had no fixed opinion as to guilt but excused because they would require defendant to offer evidence) (TR 825, 723).

Others felt their opinions of guilt were fixed since they had knowledge that the first trial had resulted in a conviction. *See, e.g.*, statements of the following veniremen: Venireman # 9, Campbell (cannot presume defendant innocent because he has "already been tried") (TR 750); Venireman # 12, Nelson (knew very little of background of the case, but excused because he would require defendant to produce some evidence since he had already been convicted in one fair trial) (TR. 769); Venireman # 13, Neal (very little exposure to pre-trial publicity, but excused because he cannot "conceivably think that twelve people would convict him unless he was guilty") (TR 809–10). Still others felt that since Swindler had been convicted once, that con-

viction should stand and he should not be entitled to a second trial. *See, e.g.*, the following statements. Venireman # 34, Snellgrove (excused because of belief that Swindler's first trial was fair) (TR 988); Venireman # 45, Nichols (excused because defendant had "already been proved guilty" and should not have another trial) (TR 1055). While these legal misunderstandings may require excusal for cause, they do not necessarily evince a wave of public passion against this particular defendant.

In this case, the trial court advised counsel that all doubts or questions about the impartiality of any prospective juror would be resolved by excusing that person. (T. 1559). A review of the voir dire indicates that the trial court did exactly that. The trial judge is to be commended for his cautious approach, particularly when, as in this case, the defendant faces the possibility of a death sentence.

It is reasonable to expect the number of prospective jurors excused for cause to be high in a sensational case such as this. There was unquestionably a great deal of publicity. Furthermore, there is an understandable reluctance on the part of many to serve on a jury where the imposition of the death penalty lurks as a possibility, as evidenced by the voir dire of Cora Owens:

Q. No one then has ever expressed any opinion about what they felt about the case?

A. Well, except for my ex last night, he just said that he was trying to tell me how to get off [the jury] if I wanted off.

(T. 1422).

A review of the voir dire of prospective jurors does reveal that a large number of those questioned had at least some knowledge of the case. But clearly, mere knowledge or remembrance of the facts surrounding the case is not the same as a deep and bitter prejudice fueled by "so huge a

---

5. However, it is instructive to note that in *Yount*, 163 veniremen were questioned, all but two of whom had some knowledge of the case. Seventy-seven percent of those questioned admitted they would carry an opinion into the jury box. Eight of the fourteen actually seated as jurors or alternates admitted that at some time they had formed an opinion as to the defendant's guilt.

wave of public passion" against the defendant that even those who profess to hold no opinion must be deemed tainted. *Irvin, supra.* The United States Supreme Court has held that there is no requirement that jurors be totally ignorant of the facts and issues involved.

> In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases.

*Irvin,* 366 U.S. at 722–23, 81 S.Ct. at 1642.

Two other factors lend support to the trial court's finding that an impartial jury could be empaneled in Scott County. First, by the time the second trial convened, over two years had elapsed since Officer Bassett's killing. In the case of *Simmons v. Lockhart,* the defendant's trial began only seven months after the murders of three victims. The Court of Appeals for the Eighth Circuit affirmed the trial court's refusal to move the trial from the county in which the victims were abducted and noted: "Seven months is not long enough to allow complete forgetfulness of such a major event as this, but it may be long enough to allow the initial heat and hostility to dissipate, particularly when the local press had not kept the story in the forefront of public attention." *Simmons,* 814 F.2d at 510. The two-year interim in Swindler's case suggests that the nature and extent of the publicity must surely have diminished along with the heat and hostility. In fact the voir dire suggests that exposure of many veniremen to publicity surrounding the case occurred immediately after the shooting occurred, or around the time of first trial. *See, e.g.,* statements of the following: Venireman # 53, Roderick (heard news accounts about his first trial.") (TR 1104); Venireman # 57, Ryne (only knowledge came from newspaper accounts "at the time") (TR 1127); Venireman # 71,

Williams ("Well I did read the newspaper during the other trial.") (TR 1201).

Second, the fact of the matter is that the defendant was not tried in the community, or county where the crimes were committed. As juror Owens noted in voir dire: "I have heard a little bit about the case, but I didn't pay too much attention to it because it wasn't right here in town [Waldron, Scott County]." (T. 1421). Cases such as *Patton v. Yount, supra,* and *Simmons v. Lockhart, supra,* by which this court is bound, have upheld the trial court's refusal to move the trial from the situs of the crime. This court finds no manifest error in the trial court's determination that the defendant could receive a fair trial in this changed venue in a different county and different judicial district.

■ The Arkansas statute in question, which purports to limit a criminal defendant to one change of venue, is not unconstitutional on its face. As with Article 2, § 10 of the Constitution of Arkansas,[6] the statute can, and must, be read as operative only within the bounds of the sixth and fourteenth amendments to the United States Constitution.

■ In this case, the trial court apparently had some misapprehension about its power to grant a second change of venue. However, even if the trial judge erroneously believed that Ark.Code Ann. § 16–88–207 prevented absolutely a second change of venue, the court expressed a willingness to consider the constitutional implications of the statute if necessary to preserve the defendant's right to a fair trial. (TR 879).

As in the case of *Simmons, supra,* the trial court gave alternative reasoning for denying the change of venue and did not base his decision solely on the belief that he lacked the authority to grant the change. Even if there were error, there was no actual prejudice since the seated jury was composed of those who either had virtually no knowledge of the case, or who

---

**6.** The constitutional provisions limit venue in criminal cases to a county in the judicial district

in which the indictment was brought.

had tentative opinions which could be set aside.

Accordingly, this court having found no manifest error in the decision of the trial court not to permit a change of venue from Scott County, this ground for relief is DENIED.

### III.

■ For his next point the petitioner alleges that three jurors were seated who should have been excused for cause. The strong presumption of correctness of the trial court's findings, discussed *infra,* is equally applicable to findings of impartiality of individual jurors:

There are good reasons to apply the statutory presumption of correctness to the trial court's resolution of these questions [of impartiality of jurors]. First, the determination has been made only after an often extended voir dire proceeding designed specifically to identify biased veniremen.... Second, the determination is essentially one of credibility, and therefore largely one of demeanor. As we have said on numerous occasions, the trial court's resolution of such questions is entitled, even on direct appeal, to "special deference." *E.g., Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 500, 104 S.Ct. 1949, 1959, 80 L.Ed.2d 502 (1984). The respect paid such findings in a habeas proceeding certainly should be no less.

*Yount,* 467 U.S. at 1038, 104 S.Ct. at 2892.

Neither the fact that the three jurors in question had knowledge of the case, nor the fact that they held tentative opinions as to the defendant's guilt rendered them ineligible to serve, so long as they could set aside any opinion they might have had and so long as they could assure the court that their verdict would be based solely on the evidence presented at trial.

To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be

to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin,* 366 U.S. at 722–23, 81 S.Ct. at 1642–43. The court has reviewed the voir dire of each of the three jurors and finds no manifest error in the trial court's finding that each could set aside any preconceived notions.

Accordingly, this ground for relief is DENIED.

### IV.

■ The petitioner next alleges that he was denied a fair trial at the penalty phase of his trial when the trial court denied a request for a one-day continuance so that he could offer the testimony of Mr. Don Reid. Mr. Reid would have testified that death by electrocution constitutes cruel and unusual punishment. The testimony would have centered on the effects of electrocution on the human body. Petitioner urges that he was entitled to present this testimony as mitigating evidence, so the jury could decide whether electrocution was an appropriate punishment for his crime.

The trial court refused to grant the continuance because it considered testimony about the effects of electrocution on the human body to be inadmissible as mitigating evidence. The judge opined that a determination as to whether electrocution constituted cruel and unusual punishment was a question of law, not of fact, thus was outside the province of the jury.

The petitioner's argument has now been mooted by the fact that the General Assembly of the State of Arkansas has changed the method of execution from electrocution to lethal injection.[7] The change would permit the petitioner now to elect either of these methods by which to die. Even if there were error in the exclusion of the testimony, the petitioner has suffered no actual harm in the jury's not being apprised of the pain and suffering incurred

---

7. Ark.Code Ann. § 5–4–617.

during an electrocution. The petitioner need not choose that method of execution.

Regardless, the trial court's ruling on the matter was not erroneous. The defendant in a death case is granted wide latitude in presenting mitigating evidence in the penalty phase of the trial. But even Yankee stadium has a fence around it. The trial court is not precluded from excluding "evidence" which is irrelevant to the defendant's character, prior record, or the circumstances of the offense. *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

▊▊ The jury has no duty to determine the method of execution, any more than it has a duty to determine the specific penitentiary in which a defendant should be incarcerated. The pain associated with electrocution is no more relevant to the penalty phase of a murder trial than would be the horror stories of atrocities that go on within our penitentiaries. The petitioner was not entitled to have the testimony presented. The denial of the motion for continuance was proper since the testimony to be offered was correctly deemed inadmissible.

Accordingly, this ground for relief is DENIED.

## V.

▊▊ The petitioner alleges that Ark. Code Ann. § 5–4–604, which governs what constitutes an "aggravating circumstance" for purposes of supporting the imposition of the death penalty, was unconstitutionally applied to him. At the penalty phase of the trial, the court instructed the jury that it could consider as an aggravating circumstance whether the defendant had knowingly created a great risk of death to a person other than the victim. The trial court gave the instruction over the defense objection that there was insufficient evidence in the record to support the giving of the instruction. This ground is patently meritless.

The facts recited by the Supreme Court of Arkansas indicate ample evidence that the petitioner knowingly created a great risk of death to a person other than the victim:

> The shots were fired in the direction of the station-store front. The evidence is that the officer was struck twice and that Swindler fired twice, but that does not mean that Swindler had any regard for other people in the vicinity. According to the evidence there were at least three people other than the officer in the vicinity; Tinder, Cardwell and Mrs. Cardwell. Swindler could not even swear that he only shot twice; he could not swear that he knew he shot a policeman until after it was done. Tinder was standing behind the counter inside a store front that was virtually all glass. The fact that there may have been a few gasoline pumps or stanchions between Swindler and the store front begs the question.... There was ample evidence Swindler had no regard for the lives of others in the vicinity. Such evidence was in Tinder's testimony, Cardwell's testimony, and all those loaded guns, and even Swindler's own testimony."

267 Ark. at 434, 599 S.W.2d at 99.

These findings are entitled to a presumption of correctness, just as are those of the trial court. *Sumner v. Mata, supra.* Swinldler's own testimony in the case confirms that he went into the store to ask for directions, saw Tinder and Officer Basnett talking, and went back outside. (T. 2006). Swindler even mentions that, once outside, he saw a couple of children on bicycles. (T. 2008). Clearly, there was ample evidence in the record to support giving the instruction.

Accordingly, this ground for relief is DENIED.

## VI.

Petitioner next asserts that he was denied the effective assistance of counsel at trial. In the case of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Court established two requirements for finding ineffective assistnce of counsel. "First, the defendant must show that counsel's performance was deficient. This requires showing that coun-

sel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* at 687, 104 S.Ct. at 2064.

The court further explained:

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.... A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." ... There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Id.* at 689, 104 S.Ct. at 2065 (citations omitted). The Court went on to say:

[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Id.* at 691, 104 S.Ct. at 2066. The petitioner's claims of ineffective assistance of counsel must be analyzed against the backdrop of these settled legal principles.

### A.

██ Petitioner first asserts that his counsel was ineffective because he failed to follow statutory procedures when moving for a change of venue. Arkansas, by statute,[8] requires that a motion for change of venue be supported by affidavits or sworn testimony. None of the six defense motions for mistrial/change of venue was so supported.

Had the trial judge refused to consider the defense motions based on the absence of statutory compliance, perhaps the petitioner could argue that counsel's performance was deficient. However, in this case, the trial judge considered each motion on the merits, ignoring the absence of supporting documentation. It is unnecessary for this court to speculate why the affidavits were not offered simultaneously with the motions, or why the trial court considered the motions as properly submitted and ripe for decision. The record shows that a number of exhibits not explicitly required by statute were offered in support of the last motion. (TR 1527). In any event, the motions were all decided on the merits, as if they had been properly submitted. Thus this court does not find that the counsel's failure was an error so serious as to amount to constitutionally deficient performance.

Even if counsel's failure to file the documents were deemed deficient, petitioner's claim could not succeed, since there is no showing that he was prejudiced. Having held that it was not error to deny the second change of venue, the court can find no prejudice in counsel's failure to file supporting documents with the motion for change of venue.

8. Ark.Code Ann. § 16–88–204.

## B.

 Petitioner also alleges that his counsel rendered constitutionally ineffective representation by failing to investigate and offer mitigating evidence regarding his mental problems at the penalty phase of the trial.

The petitioner's trial counsel testified at the habeas hearing that the petitioner was sent for a mental examination before his first trial. H.T. 14. Counsel testified that he had investigated the defendant's mental condition by way of securing records from the state hospital, where the mental evaluation was performed. Counsel testified as follows:

Q. Do you recall ever have [sic] conversations with the psychiatrist or psychologist [at the state hospital] who examined John Swindler?

A. I don't have any independent recollection of it now.

Q. In any event, none of those officials or persons were called in support of any mitigating circumstances, were they, in either the first or the second trial?

A. I think that my basis on that was that I read over the reports. And I felt that what was in those reports was more damaging than was helpful.

H.T. 15. Counsel further testified:

A. We never—I don't think we even though about introducing the State Hospital stuff at the second trial. The decision, I think, was made at the first trial not to introduce that, and we never changed that decision.

Q. Do you recall what the gist of the State Hospital—the result of their evaluation was?

A. Well, it was, of course, unfavorable to him, but—well, we—what we were afraid to do was offer part of it because then the prosecutor, I'm sure, would want to offer all of it, and there was some damaging comments either from Mr. Swindler or something else in those reports that we felt would not be helpful to us.

Q. So it's fair to say then you didn't think that that would be mitigating evidence?

A. That's correct.

H.T. 74.

There is absolutely nothing in the record of the habeas hearing to establish that the petitioner indeed suffered any mental disturbance which could have been introduced at his trial, except the petitioner's testimony. *Cf. Wilson v. Butler,* 813 F.2d 664 (5th Cir.1987) (petitioner attached a psychiatric report to his habeas petition that supported his contention of mental defect). There was evidence that the reports from the State Hospital would have contained information about personality defects, had they been present, as well as a complete background of the patient's mental history.

In sum, from the evidence presented, the court cannot conclude that trial counsel's investigation was inadequate or unreasonable. The decision not to introduce psychiatric records was a strategic decision based on the fact that it contained more damaging than helpful information. Given the strong presumption of competence, this court cannot find that counsel's performance was constitutionally deficient.

## C.

 Petitioner's last allegation regarding ineffective assistance of counsel is that trial counsel failed to request an admonition to the panel of veniremen not to discuss or read about the case. The trial transcript indicates that the trial court did indeed admonish the veniremen: "All right, now to you jurors whose names were not read, you will be excused until 9:30 tomorrow morning. And again, it is important that you do know that you cannot remain in the courtroom during examination of the individual jurors. I would say this to you, also. None of you have been selected on the jury, but all of you are on the jury panel. So certainly do not permit anyone, under [any] possible circumstances, to discuss this case in your presence. Certainly you should not discuss it with any other member of the jury panel." (TR 684–85). Counsel's failure to request different or

further admonition does not rise to the level of constitutional ineffective assistance of counsel.

Petitioner further contends that his trial counsel erred in failing to object to the admission of a record of an armed robbery during the penalty phase of the trial which did not indicate that he was represented by counsel. The court has reviewed the record of that conviction even though the issue is arguably not properly before the court due to procedural default. The record which was introduced rather clearly indicates that the State of South Carolina was represented by John W. Foard, Jr. (TR. 2187–88). The allegation is soundly rebutted by the record of the trial.

In light of the record, this court cannot conclude that the representation the petitioner received was outside the range of reasonable professional assistance. This ground for relief is DENIED.

## CONCLUSION

It is the considered opinion and judgment of this court that the petitioner, John Edward Swindler, was afforded a fair and constitutional trial before the Circuit Court of Scott County, Arkansas. Accordingly, the petition for writ of habeas corpus is hereby denied.