**John Edward SWINDLER, Appellant,**

v.

**A.L. LOCKHART, Commissioner of the Arkansas Dept. of Correction, Appellee.**

No. 88–2387.

United States Court of Appeals, Eighth Circuit.

Submitted April 12, 1989.

Decided Sept. 26, 1989.

Rehearing and Rehearing En Banc Denied Nov. 6, 1989.

Thurman Ragar, Jr., Van Buren, Ark., for appellant.

Jack Gillean, Little Rock, Ark., for appellee.

Before BOWMAN and WOLLMAN, Circuit Judges, and HENLEY, Senior Circuit Judge.

BOWMAN, Circuit Judge.

John Edward Swindler appeals from the District Court's [1] denial of his petition for a writ of habeas corpus under 28 U.S.C. § 2254. We affirm.

On September 24, 1976, Swindler, in flight from South Carolina where he was wanted for the murders of two teenagers, stopped off at a service station in Fort Smith, Arkansas apparently to ask directions to Kansas City. At the service station, Swindler was approached by Randy Basnett, a Fort Smith police officer. Swindler shot and killed Officer Basnett. Before he died, Basnett was able to fire five or six times through the car door injuring Swindler. Swindler was caught shortly thereafter.

Swindler was convicted of capital felony murder for the shooting death of Officer Basnett, and was sentenced to death. The Supreme Court of Arkansas overturned

that conviction because the trial court erroneously refused to grant a change of venue from Sebastian County, the situs of the killing, and because the trial court failed to excuse three jurors. *Swindler v. State,* 264 Ark. 107, 569 S.W.2d 120 (1978).

Swindler was retried in Scott County, Arkansas, which adjoins Sebastian County, and convicted of capital felony murder for the second time and sentenced to death. The second conviction and death sentence were affirmed by the Supreme Court of Arkansas. *Swindler v. State,* 267 Ark. 418, 592 S.W.2d 91 (1979), *cert. denied,* 449 U.S. 1057, 101 S.Ct. 630, 66 L.Ed.2d 511 (1980). Subsequently, Swindler sought post-conviction relief pursuant to Rule 37 of the Arkansas Rules of Criminal Procedure. This relief also was denied by the Supreme Court of Arkansas. *Swindler v. State,* 272 Ark. 340, 617 S.W.2d 1 (1981), *cert. denied,* 454 U.S. 933, 102 S.Ct. 431, 70 L.Ed.2d 240 (1981).

State post-conviction remedies thus exhausted, Swindler filed a writ of habeas corpus in the District Court pursuant to 28 U.S.C. §§ 2242 and 2254 alleging six grounds for relief: (1) a venireman was erroneously excluded after he voiced only general objections to the death penalty; (2) Swindler was improperly denied a second change of venue; (3) jurors biased against Swindler were seated against the objections of defense counsel; (4) Swindler was denied a continuance at the penalty phase of his trial to enable him to present a witness on his behalf; (5) an "aggravating circumstance" was erroneously considered by the jury during the penalty phase of his trial; and (6) Swindler was denied effective assistance of counsel at trial.

After a hearing, the District Court denied Swindler's petition. 693 F.Supp. 760 (E.D.Ark.(1988)). On appeal, Swindler repeats his six grounds for relief. Finding the claims meritless, we affirm the judgment of the District Court.

---

1. The Honorable Henry Woods, United States District Judge for the Eastern District of Arkansas.

## I.

Swindler contends that a member of the venire, Mr. Carmack, was excluded improperly after expressing only a general objection to the death penalty. We disagree.

In *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Supreme Court clarified the standard for determining when a prospective juror may be excluded for cause because of his view on capital punishment. *Witt* held that the proper test is whether the juror's views on capital punishment would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Id.* at 424, 105 S.Ct. at 852 (quoting *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980)). The Court rejected the standard, taken from a footnote in *Witherspoon v. Illinois,* 391 U.S. 510, 522-3 n. 21, 88 S.Ct. 1770, 1776-77, n. 21, 20 L.Ed.2d 776 (1969), that in order to exclude a juror for cause it must be "unmistakably clear" that the juror would "automatically" vote against the imposition of the death penalty.[2] *Witt,* 469 U.S. at 424-25, 105 S.Ct. at 852. In this regard, this Circuit recently stated:

> We perceive the fundamental difference between *Witherspoon* and the *Adams–Witt* rule to be one of lessened degree as to the burden of proof. In order to exclude a juror under *Witt* the State no longer must show that it is unmistakably clear that the juror's opposition to capital punishment would automatically cause exclusion.

*Hulsey v. Sargent,* 865 F.2d 954, 956 (8th Cir.1989) (footnote omitted).

*Witt* also clarified the degree of deference a federal habeas court must give to a state trial judge's determination that a potential juror's opposition to the death penalty is cause for exclusion. The Court stated:

> Last term, in *Patton* [*v. Yount,* 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984) ], we held that a trial judge's finding that a particular venireman was not biased and therefore was properly seated was a finding of fact subject to § 2254(d). We noted that the question whether a venireman is biased has traditionally been determined through voir dire culminating in a finding by the trial judge concerning the venireman's state of mind. We also noted that such a finding is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province. Such determinations were entitled to deference even on direct review; "[t]he respect paid such findings in a habeas proceeding certainly should be no less." *Id.,* at 1038, 104 S.Ct. at 2892.
>
> *Patton's* holding applies equally well to a trial court's determination that a prospective capital sentencing juror was properly excluded for cause.
>
> * * * * * *
>
> Once it is recognized that excluding prospective capital sentencing jurors because of their opposition to capital punishment is no different from excluding jurors for innumerable other reasons which result in bias, *Patton* must control. The trial judge is of course applying some kind of legal standard to what he sees and hears, but his predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record. These are the "factual issues" that are subject to § 2254(d).

*Witt,* 469 U.S. at 428-29, 105 S.Ct. at 854 (footnotes omitted). It follows from *Patton* and *Witt* that our task in this section 2254 case is to determine whether fair sup-

---

**2.** The Supreme Court stated:

> We note that, in addition to dispensing with *Witherspoon's* reference to "automatic" decisionmaking, this standard likewise does not require that a juror's bias be proved with "unmistakable clarity." This is because determinations of jurors bias cannot be reduced to question-and-answer sessions which obtain re-

sults in the manner of a catechism. What common sense should have realized experience has proved: many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear[.]"

*Witt,* 469 U.S. at 424-25, 105 S.Ct. at 852.

port exists in the record as a whole for the trial court's determination that Carmack's view on capital punishment would "prevent or substantially impair the performance of his duties as a juror." *See Darden v. Wainwright,* 477 U.S. 168, 176, 106 S.Ct. 2464, 2469, 91 L.Ed.2d 144 (1986); *Hulsey,* 865 F.2d at 959.

The voir dire of Carmack was as follows:

Q. Let me ask you this. Do you think the death penalty is proper punishment for some crimes?

A. I wouldn't think so.

Q. Do you believe in the death penalty?

A. Not so much.

Q. Do you understand that under the law of Arkansas that it is the jury that finds whether a person is guilty or not guilty, and then if the jury finds the defendant guilty then the jury actually sets the punishment, that is not done by the Judge. Now, if you were on this jury, and you listened to all the evidence, could you, under any circumstances, vote for the death penalty?

A. I wouldn't want to.

Q. I understand you might not want to, but you know it is the law of Arkansas, and if you listened to the evidence and you found that under our law this was a proper case for the death penalty, then could you follow Arkansas law, or would you stick to your own personal feelings?

A. Well, now I would stick to what I believe in.

Q. So are you telling me that no matter what the facts are, or what the law is, that you would not vote for the death penalty?

A. No, I don't think I would.

Q. Okay, now you say you don't think you would. Can you tell me for sure that you would or would not?

A. Well, I wouldn't then, I will put it that way.

Q. No matter what the facts were, or what the law was, you would not vote for the death penalty?

A. No, I don't believe I could, and then have a clear conscience.

MR. KARR: I submit him for cause, Your Honor.

THE COURT: All right, Mr. Carmack, apparently what you are telling Mr. Karr is that you do oppose or have conscientious objections to the death penalty?

A: Right.

THE COURT: Now, what he has asked you is, and I want to ask you, too, to be sure that I understand. Is that feeling that you have or your belief so fixed and strong that regardless of what the facts might be, regardless of how bad they might be, or how aggravating they might be, in any case, that under no circumstances could you consider imposing the death penalty?

A. I wouldn't.

THE COURT: In any case?

A. I don't believe I would.

DEFENSE ATTORNEY: I have no questions, your Honor.

THE COURT: All right, he will be excused for cause.

(Tr. 1446–48). We conclude that the preceding voir dire provides ample support for the trial court's determination that Carmack should be excused because of his opposition to the death penalty. Therefore, we affirm the District Court's ruling that the trial court properly excluded this juror.[3] 693 F.Supp. at 763.

---

**3.** Swindler's claim that Carmack expressed only general objections to the death penalty because he used words such as "believe" and "think" is unpersuasive when one reads the voir dire in its entirety. *See Witt,* 469 U.S. at 424–26, 105 S.Ct. at 852–53, where the Supreme Court held that a potential juror's removal for cause was proper on the basis of the following voir dire:

"[Q. Prosecutor:] Now, let me ask you a question, ma'am. Do you have any religious beliefs or personal beliefs against the death penalty?

"[A. Colby:] I am afraid personally but not—

"[Q]: Speak up, please.

"[A]: I am afraid of being a little personal, but definitely not religious.

"[Q]: Now, would that interfere with you sitting as a juror in this case?

"[A]: I am afraid it would.

"[Q]: You are afraid it would?

"[A]: Yes, Sir.

"[Q]: Would it interfere with judging the guilt or innocence of the Defendant in this case?

"[A]: I think so.

## II.

Swindler next argues that the state trial court erred in denying his motion for a second change of venue. Swindler argues that he was entitled to a change of venue because of adverse pretrial publicity surrounding his retrial. Swindler further contends that he was denied a second change of venue because an Arkansas statute, Ark.Code Ann. § 16–88–207 (1987), which purportedly limits a criminal defendant to one change of venue, was unconstitutionally applied. We disagree.

After Swindler's first conviction was reversed by the Arkansas Supreme Court because the trial court failed to grant a change of venue, Swindler's trial was transferred to Scott County, which is adjacent to Sebastian County. Waldron, the County seat, is about 45 miles south of Fort Smith, the situs of the crime.

Swindler requested a change of venue at the close of each day of voir dire on the ground that the voir dire established that an impartial jury could not be seated. Although the trial judge expressed reservations as to his authority to grant the motion because of the Arkansas venue statute, he did however express a willingness to consider the constitutional implications of the statute if necessary.[4] After the jury had been selected, Swindler moved again for a change of venue. The trial court denied the motion, again noting the Arkansas statute, but also denying it on the ground that the jury was impartial. (Tr. 1559–60). Thus, the Arkansas statute aside, the trial court based its denial of a second change of venue on the fact that

Swindler had not established prejudice resulting from pretrial publicity.

In *Simmons v. Lockhart*, we held that although the state court misinterpreted Arkansas law on change of venue, there was not reversible error because the state court also based its ruling on its finding that the jury was impartial. 814 F.2d 504, 507–08; (8th Cir.1987) *see also Perry v. Lockhart*, 871 F.2d 1384, 1390 (8th Cir. 1989). The state court's determination that the jury was not prejudiced by the pretrial publicity and thus impartial is entitled to deference and can be overturned only for "manifest error." *Yount*, 467 U.S. at 1031, 104 S.Ct. at 2888 (quoting *Irwin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961)). We must give the state court's findings of fact a "presumption of correctness," and may not set them aside unless they are not fairly supported by the record as a whole. 28 U.S.C. § 2254(d)(1)–(8); *see Simmons*, 814 F.2d at 508. After a careful review of the record, we agree with the District Court that the trial court did not err in denying a second motion for change of venue. 693 F.Supp. at 763–66.

The only evidence regarding pretrial publicity in this case is found in the transcript of the voir dire. The voir dire lasted five days and covers nearly 900 pages of transcript, the larger part of which relates to the extent of the pretrial publicity and the effect it had on the veniremen. One hundred and twenty veniremen were examined and seventy-nine were excused for cause, although not all of those were excused on

---

"[Q]: You think it would.
"[A]: I think it would.
"[Q]: Your honor, I would move for cause at this point.
THE COURT: All right. Step down." Tr. 266–67.
469 U.S. at 415–16, 105 S.Ct. at 847–48.

**4.** After the second day of voir dire, Swindler moved for a change of venue. The trial judge denied the motion, stating:
Also, as you have correctly pointed out, under the Arkansas law a defendant is only entitled to one change of venue, and the court feels that by the news media, and the advances that have been made, and the television, that per-

haps there needs to be some changes perhaps made in the law.

\* \* \* \* \* \*

I do want to proceed again tomorrow and see what progress, if any, can be made in the selection of the jury, then if the court is convinced that a jury cannot be obtained here, that jurors here do not have opinions or would be qualified to serve, then the court then would face the legal matter as to whether or not the rights you assert under the United States Constitution are such that it could be done contrary to the provisions of law. (Tr. 1074–75).

account of pretrial publicity.[5] Although the voir dire reflects that there was a great deal of publicity in this case, the record of the voir dire does not reveal "such hostility towards [Swindler] by the jurors who served in his trial as to suggest a partiality that could not be laid aside." *Murphy v. Florida,* 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975).

■ Swindler points to the fact that ninety-eight out of the 120 veniremen had some knowledge of the case. However, the fact that a large number of veniremen have heard of the case is not dispositive. As we said in *Simmons:* "[T]he fact that a venire panel is well informed on reported news is not by itself prejudicial. The accused is not entitled to an ignorant jury, just a fair one." *Simmons,* 814 F.2d at 510 (all but one of the fifty-six veniremen had heard of the case); *see also United States v. Bliss,* 735 F.2d 294, 298 (1984) (virtually all veniremen had some knowledge of the case). The question is whether "the pretrial publicity was so intensive and extensive or the examination of the entire panel revealed such prejudice that a court could not believe the answers of the jurors" regarding impartiality. *Beck v. Washington,* 369 U.S. 541, 557, 82 S.Ct. 955, 964, 8 L.Ed.2d 98 (1962). We agree with the District Court that an examination of the voir dire "do[es] not necessarily evince a wave of public passion against this particular defendant." 693 F.Supp. at 764.

Besides our review of the voir dire, other factors lend support to the trial judge's determination that an impartial jury could be impaneled in Scott County. First, Swindler's second trial was conducted over two years after the commission of the crime, and over thirteen months after the first trial. The Supreme Court in *Yount* stated: "[I]t is clear that the passage of time between a first and a second trial can be a highly relevant fact." 467 U.S. at 1035, 104 S.Ct. at 2890. This is especially so

when, as here, most of the publicity surrounding the crime occurred before and during the first trial. *See, e.g.,* Venireman # 53, Roderick (heard news accounts about first trial but nothing since) (Tr. 1104); Venireman # 57, Rhyne (only knowledge came from media accounts of the murder at the time it occurred) (Tr. 1127).

In *Simmons,* in upholding a trial court's refusal to grant a change of venue, we indicated that the lapse of seven months was a relevant factor minimizing the effect of pretrial publicity. "Seven months is not long enough to allow complete forgetfulness of such a major event as this, but it may be long enough to allow the initial heat and hostility to dissipate, particularly when the local press had not kept the story in the forefront of public attention." 814 F.2d at 510; *see also, Perry,* 871 F.2d at 1390 (the fact that ten months had elapsed between the crime and the trial was a factor minimizing the effect of pretrial publicity).

A second factor minimizing the effect of pretrial publicity is that Swindler was tried over forty-five miles from the situs of the murder. In *Simmons* and *Perry,* we upheld trial court decisions not to move trials involving highly publicized murders from a county only five miles from the situs of the murders. *Simmons,* 814 F.2d at 506; *Perry,* 871 F.2d at 1389.

These factors combined with our review of the voir dire lead us to conclude that the trial court did not commit manifest error in denying Swindler's change of venue motion. To the contrary, we are satisfied that the painstakingly thorough voir dire assured that a fair and impartial jury was impaneled.

### III.

■ Swindler's next argument for reversal concerns the failure of the trial court to excuse for cause three impaneled jurors

---

5. Of the veniremen excused for cause, four were excused because of their opposition to the death penalty. Others were excused because of an inability to accept philosophically the legal concepts of "presumption of innocence" and "burden of proof." *See, e.g.,* Veniremen # 4 May (no pretrial publicity exposure, but could not accept presumption of innocence) (Tr. 725); Venireman # 14, Stinson (excused because he would require defendant to offer evidence of innocence) (Tr. 828).

who, he contends, exhibited fixed opinions as to his guilt.

In *Yount,* the Supreme Court held that the question of whether a particular juror "could set aside any opinion he held and decide the case on the evidence" is a question of "historical fact" to be determined by the state trial court. 467 U.S. at 1036, 104 S.Ct. at 2891. Therefore, a habeas court must afford this determination the presumption of correctness due a state court's factual findings under 28 U.S.C. § 2254(d). *Id.* at 1036–38, 104 S.Ct. at 2891–92; *Simmons,* 814 F.2d at 512. The question, then, for this court is "whether there is fair support in the record for the state courts' conclusion that the jurors here would be impartial." *Yount,* 467 U.S. at 1038, 104 S.Ct. at 2892.

Swindler challenges the seating of jurors Sunderman, Staggs, and Jones.[6] The District Court reviewed the record and determined that the trial court's decision not to excuse these jurors was fairly supported by the record. 693 F.Supp. at 766. Our own independent examination of the voir dire reveals ample support for the trial court's findings of impartiality.

During the voir dire, juror Sunderman stated that he had heard and read about the shooting and Swindler's first trial. Although he stated that he had formed an opinion as to Swindler's guilt after the first trial, he also made it clear that he could lay aside this opinion and impartially decide the case. *See* Tr. 972 (presently doesn't have an opinion as to how the case should be decided); Tr. 973 ("I would make my decision based upon the facts."); Tr. 978–9 ("I did not hear all of the evidence [at the first trial] and based on what I did hear at that particular time I had an opinion at that time; at this time I would base my opinion on the evidence that was presented."); Tr. 979–80 ("Well, as I said before, I had my opinion at that time, and I feel like if I sit on any jury it would be my duty to make my decision at that time based on the facts that were presented to me, not what had been presented somewhere else."); Tr. 982 ("If I were sitting on the jury I would weigh the evidence that was presented to me in the courtroom, and not what had been carried on TV or in the newspaper.").

Juror Staggs also stated that he had heard about the shooting and first trial. (Tr. 1231–32). Although the questioning at voir dire produced several ambiguous responses requiring, at times, the court's interjection for clarification (Tr. 1222, 1228–30), the record as a whole clearly supports the trial court's determination that Staggs was impartial.[7]

---

6. Swindler challenged each of these jurors after extensive voir dire. After the trial court refused to remove the jurors for cause, Swindler did not strike any of them with an available peremptory and announced them "good" for the defense.

7. Illustrative of Staggs's ability to lay aside any opinion he might have had is this exchange with defense counsel after Staggs indicated he had formed an opinion as to Swindler's guilt after the first trial:

Q. Do you have that opinion at this time?
A. Yes, I guess you would say, to an extent. Not that I couldn't change it if it was different, but I still believe, you know, you would have to have some confidence in the people.
Q. Is that a fixed opinion, you feel you would have difficulty getting rid of that opinion?
A. No, I can accept facts.
 * * * * * *
Q. I am asking you, would you require something from the defendant's side of the case before you would change the opinion that you have?

A. No. If I was on the jury I could listen, you know, to the trial; and if there was a difference, I wouldn't pay any attention to my opinion because if I listen to that I will listen to the facts that are brought out.
 * * * * * *
Q. You would not compare the State's evidence, or whatever the evidence might be with what had been reported?
A. I would only want to hear what went on at the present.
Q. Now, if you felt that the opinion was making it difficult for you while you were deliberating on the case, after the case was presented to you, and you felt you were having difficulties getting rid of your opinion, or your opinion was conflicting with what the evidence had been, do you feel you could report that to the Court, the Judge?
A. I wouldn't serve on it if I couldn't drop my opinion; I wouldn't go with a thought either way.
(Tr. 1235–37).

The voir dire of juror Jones was the most extensive. (Tr. 1146–65). His responses made it clear that he did not want to serve on the jury. (Tr. 1150, 1161). Jones, who exhibited more knowledge about the case than any other juror, stated that he had formed an opinion as to Swindler's guilt after the first conviction. Although Jones's initial responses were at times contradictory, extensive questioning by defense counsel clarified his position. (Tr. 1147, 1155–56). After numerous questions concerning his tentative opinion, Jones stated: "[I]f I was put on that jury I would listen to what was said, and base my opinion on that, period." (Tr. 1158). And, again, he reiterated his impartiality, stating: "I am trying to make it clear to you, which I think is unnecessary, that I would take the evidence and the law in the case and base my opinion on that." (Tr. 1158).

It was for the trial judge to assess Jones's demeanor and attitude. *See Yount*, 467 U.S. at 1038–1040, 104 S.Ct. at 2892–93. Granting the appropriate deference to the trial court's determination of impartiality, we agree with the District Court that the trial court's decision not to excuse Jones for cause is fairly supported by the record.

### IV.

Swindler next contends that he was denied a fair trial when the trial court refused to grant a continuance at the penalty phase of his trial to enable him to offer the testimony of an expert regarding the effects of electrocution on the human body. Swindler intended this evidence to show that death by electrocution is cruel and unusual punishment and for the jury to consider this evidence as a mitigating factor. We find no merit in this claim.

■ A trial court enjoys broad discretion in ruling on a motion for a continuance. *See, e.g., Morris v. Slappy*, 461 U.S. 1, 11, 103 S.Ct. 1610, 1616, 75 L.Ed.2d 610 (1983); *Loggins v. Frey*, 786 F.2d 364, 366–67 (8th Cir.1986), *cert. denied*, 479 U.S. 842, 107 S.Ct. 153, 93 L.Ed.2d 93 (1986). "[O]nly an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable

request for delay' " rises to the level of a constitutional violation. *Morris*, 461 U.S. at 11–12, 103 S.Ct. at 1616–17 (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 921 (1964)).

■ Here, the trial court's refusal to grant the continuance was clearly not unreasonable because Swindler did not have a justifiable reason for the requested delay. As the trial court ruled, the testimony for which Swindler wanted the delay was irrelevant as mitigating evidence; whether death by electrocution constitutes cruel and unusual punishment is a question of law, and is not within the province of the jury to decide. It follows that the trial court did not abuse its discretion in denying Swindler's request for a continuance.

### V.

■ Swindler next argues that the trial court committed constitutional error by instructing the jury that it could consider as an aggravating circumstance whether the defendant had knowingly created a great risk of death to a person other than the victim. *See* Ark.Code Ann. § 5–4–604(4) (1987). Swindler objected to this instruction on the ground that there was not any evidence to support the giving of the instruction. This claim is meritless.

Under Arkansas law, a trial court must submit to the jury a mitigating or aggravating circumstance if there is *any* evidence, however slight, of the circumstance. *Miller v. State*, 269 Ark. 341, 354, 605 S.W.2d 430, 438 (1980). The record contains substantial evidence that Swindler knowingly created a great risk of death to a person other than the victim. As the Supreme Court of Arkansas found:

[S]hots were fired in the direction of the station-store front. The evidence is that the officer was struck twice and that Swindler fired twice, but that does not mean that Swindler had any regard for other people in the vicinity. According to the evidence there were at least three people other than the officer in the vicinity; Tinder, Cardwell and Mrs. Cardwell. Swindler could not even swear that he

only shot twice; he could not swear that he knew he shot a policeman until after it was done. Tinder was standing behind the counter inside a store front that was virtually all glass. The fact that there may have been a few gasoline pumps or stanchions between Swindler and the store front begs the question.... There was ample evidence Swindler had no regard for the lives of others in the vicinity.

*Swindler,* 267 Ark. at 434, 592 S.W.2d at 99.

We conclude that the trial court's submission of the challenged instruction is sufficiently supported by the record.

### VI.

Finally, Swindler contends that he was denied effective assistance of counsel at trial. This claim must be evaluated against the two-prong test announced in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). First, Swindler must show that "counsel's representation fell below an objective standard of reasonableness," *id.* at 688, 104 S.Ct. at 2064–65, creating "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687, 104 S.Ct. at 2064. Second, Swindler must show that the deficient performance prejudiced the defense. *Id.* In *Strickland,* the Court explained: "Judicial scrutiny of counsel's performance must be highly deferential.... A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight." *Id.* at 689, 104 S.Ct. at 2064. Swindler's claims of

ineffective assistance of counsel are analyzed separately below.

### A.

Swindler argues that his counsel[8] rendered ineffective assistance because they failed to follow statutory procedures when moving for a change of venue. Arkansas requires that a motion for a change of venue be accompanied by affidavits or sworn testimony. *See* Ark.Code Ann. § 16–88–204 (1987). Swindler's trial counsel waited until the voir dire to move for a change of venue. None of the six motions for change of venue was supported by affidavits.

Swindler's trial counsel explained at the habeas hearing that the reason he did not file a pretrial change of venue motion accompanied by affidavits was because he felt he could better show that pretrial publicity had prejudiced Swindler's right to a fair trial through the responses of the veniremen at voir dire.[9] (H.Tr. 11–13, 21–22). As observed earlier in this opinion, a great deal of the voir dire concerned the venire panel's exposure to pretrial publicity and whether the publicity had prejudiced them. Further, counsel moved at the close of each day of voir dire for a change of venue on the ground that the questioning of the prospective jurors had established that Swindler could not receive a fair trial. A number of exhibits were offered in support of the final motion.[10] (Tr. 1527–55) Even though the motions were not supported by affidavits, the trial judge considered each motion on the merits. We agree with the District Court that the failure of counsel to

---

8. Swindler was represented at his second trial by Don Langston, now a state circuit-chancery judge in Sebastian and Crawford Counties. Judge Langston also represented Swindler at his first trial and won the reversal of that conviction in the Arkansas Supreme Court. Langston had been an attorney for over seventeen years (seven with the public defender's office) at the time of the second trial. Langston was assisted in his representation of Swindler by John W. Settle, now a municipal judge in Fort Smith, Arkansas.

9. Counsel testified at the habeas hearing that his approach in the case was:

that you could show through voir dire that there was pretrial—that there was prejudice against Mr. Swindler; therefore, you would go on the United States Constitution of due process, denial of a fair trial and things of that nature.

(H.Tr. 21).

10. These exhibits included information concerning the population of Scott County, the number of registered voters, and a jury list with notations indicating reasons for exclusion. (Tr. 1527–55).

follow statutory procedures in moving for a change of venue was not sufficiently serious to amount to a constitutionally deficient performance. 693 F.Supp. at 768. Moreover, it is apparent that Swindler suffered no prejudice from the failure of counsel to follow the letter of the statute.

### B.

 Swindler claims that his counsel rendered ineffective assistance in failing to investigate and offer mitigating evidence regarding his mental problems at the penalty phase of the trial.

Counsel testified at the habeas hearing that he had read a report prepared before the first trial on Swindler's mental condition.[11] (H.Tr. 14). The report consisted of historical data from outside sources; a medical history; reports on the physical, psychiatric, and neurological examinations conducted; a psychological assessment by the staff psychologist; and a psychiatric history. (Tr. 14). Counsel testified: "I think that my basis [for not introducing the report] was that I read over the reports. And I felt that what was in those reports was more damaging than was helpful." (H.Tr. 15). When asked the contents of the report, counsel testified: "Well, it was of course, unfavorable to [Swindler], but—well, we—what we were afraid to do was offer part of it because then the prosecutor, I'm sure, would want to offer all of it, and there was some damaging comments either from Mr. Swindler or something else in those reports that we felt would not be helpful to us." (H.Tr. 74). Counsel did not consider the report to be mitigating evidence. (H.Tr. 74).

As the Court stated in *Strickland*, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" 466 U.S. at 689, 104 S.Ct. at 2065 (quoting

*Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83 (1955)). Swindler makes conclusory allegations that counsel should have introduced the report and other evidence of his mental problems. There is nothing, however, in the record of the habeas hearing, other than Swindler's testimony, to show that Swindler in fact suffered from any mental problems. *Cf. Burger v. Kemp,* 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987) (petitioner presented affidavits at the habeas hearing that described the evidence that defense counsel might have presented); *Wilson v. Butler,* 813 F.2d 664 (5th Cir.1987) (petitioner attached a psychiatric report to his habeas petition that supported his contention of mental defect).

On the other hand, counsel testified that he obtained the state hospital report and determined that it would be more harmful than helpful to Swindler's penalty phase defense. (H.Tr. 15). Swindler has made no showing that the decision of counsel to forego use of the report was inadequate or unreasonable. Therefore, given the strong presumption of competence afforded trial counsel's performance, we cannot find that the tactical decision not to introduce the medical report constituted deficient assistance of counsel. *See Hayes v. Lockhart,* 852 F.2d 339, 351–52 (8th Cir.1988), *cert. granted, vacated on other grounds,* —— U.S. ——, 109 S.Ct. 3181, 105 L.Ed.2d 691 (1989) (held that counsel's strategic decision not to introduce psychological evidence about defendant because the risk of probable harm exceeded the possible benefit was reasonable). As we stated in *Laws v. Armontrout,* 863 F.2d 1377 (8th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 3179, 104 L.Ed.2d 1041 (1989):

> If counsel has through neglect failed to discover [mitigating] evidence, then counsel will be found ineffective. If, however, counsel did not produce the mitigating evidence because, after a reasonable investigation and exercise of professional judgment, he has determined that with-

---

11. Swindler was ordered to undergo examinations at the Arkansas State Hospital in Little Rock prior to his first trial in order to deter- mine his mental condition. Swindler spent thirty-six days at the state hospital. (Tr. 8–9).

holding such evidence is the more strategically sound course, then there has been no ineffectiveness.

*Id.* at 1385. From the evidence presented, we conclude that the investigation by counsel of Swindler's mental problems was reasonable and that the decision not to introduce the state hospital report has not been shown to be constitutionally deficient.

### C.

■ Finally, Swindler argues that counsel erred in failing to request the trial court to admonish the jury not to discuss or read about the case. A review of the record, however, shows that the trial court admonished the potential jurors on the first day of their voir dire as follows:

> All right, now to you jurors whose names were not read, you will be excused until 9:30 tomorrow morning. And again, it is important that you do know that you cannot remain in the courtroom during examination of individual jurors. I would say this to you, also. None of you have been selected on the jury, but all of you are on the jury panel. So certainly do not permit anyone, under [any] possible circumstances, to discuss this case in your presence. Certainly you should not discuss it with any other member of the jury panel.

(Tr. 684–85). Although a further admonition of the jury may have been desirable, we agree with the District Court that the failure to request an additional admonition does not rise to the level of constitutionally ineffective assistance of counsel. 693 F.Supp. at 769–70.

### VII.

Swindler has not shown any constitutional flaw in his conviction or sentence. The judgment of the District Court denying Swindler's petition for a writ of habeas corpus is affirmed.