# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-1757

_____

United States of America,                              *
                                                       *
              Appellee,                 *
                                                       *      Appeal from the United States
     v.                                            *      District Court for the
                                                       *      Western District of Missouri.
Keith D. Nelson,                                       *
                                                       *
              Appellant.                *

_____

Submitted: January 16, 2003
Filed: October 22, 2003

_____

Before HANSEN,[1] Chief Judge, BRIGHT and SMITH, Circuit Judges.

_____

HANSEN, Circuit Judge.

    After pleading guilty to the kidnap, rape, and murder of ten-year-old Pamela Butler, Keith Dwayne Nelson was sentenced to death. He raises numerous arguments

_____

[1]The author of the opinion stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on March 31, 2003. He has been succeeded by the Honorable James B. Loken.

on appeal, and, for the reasons stated below, we reject them and affirm the judgment of the district court.[2]

## I.

On September 29, 1999, Nelson approached James Robinson in the parking lot of A-1 Staffing, a temporary work service in Kansas City, Kansas, and asked Robinson if he wanted a job hauling cement out of a basement. Robinson responded that he did, and they left the A-1 parking lot in a white Ford F-150 pickup truck that Nelson was driving. Nelson and Robinson had never met before. After arriving at the job site, Nelson told Robinson that he would like to kidnap a woman and take her away from the city to torture, rape, electrocute, kill, and bury her. Nelson also told Robinson that he wanted to do this because he was going back to prison for other charges and that he wanted to go back for something big. Although the statements bothered Robinson, he decided not to contact the police because he thought that Nelson must have been joking.

Just three days later Michanne Mattson was attacked outside of her apartment building. Mattson was driving home from a friend's house in the early morning when she passed a white pickup truck parked alongside the road. After she passed the truck, it followed her for some distance into the parking lot of her apartment complex. She exited her vehicle and noticed that a man had exited the white truck. As she approached the door to her apartment building, the same man, whom she later identified as Nelson, confronted her on the sidewalk in a well lit area in front of her building. After a brief exchange, Mattson turned to go into the building, and Nelson rushed up behind her, grabbed her, and placed an eight-inch knife to her throat. He

_____

[2]The Honorable Fernando J. Gaitan, Jr., United States District Judge for the Western District of Missouri.

forced a handcuff onto Mattson's left wrist and dragged her through the parking lot toward his vehicle, exclaiming that she had better shut up and that he was going to kill her. Mattson continued to struggle, eventually escaping Nelson's grasp and calling for help. Nelson ran back to his truck and drove away.

On October 12, 1999, Nelson told an acquaintance that he had spotted a young girl in the Kansas City, Kansas, area that he wanted to kidnap, rape, torture, and kill, and that now was the time to do it. Shortly thereafter, several individuals spotted Nelson in the area of 11th and Scott Streets in a white pickup truck. Contemporaneously, ten-year-old Pamela Butler was rollerblading in the street near her residence in the same area. Nelson parked his vehicle at the side of the street and lay in wait. As Pamela skated near the slightly ajar door of the truck, Nelson quickly jumped out of the truck, grabbed her around the waist, and threw her into the truck. Pamela's sister, Penny, observed the kidnapping and saw her sister struggling with Nelson in the cab of the truck. Several witnesses also observed the kidnapping, one of whom gave chase in his own vehicle. Although Nelson eluded him, the witness was able to write down the license plate number of the truck–Missouri plate number 177-CE2. Several other eyewitnesses verified the truck license plate number.

Later that evening, the custodian of the Grain Valley Christian Church in Kansas City, Missouri, and his wife saw a suspicious white truck with Missouri license plate number 177-CE2 parked in the church lot. The custodian's wife wrote down the plate number and noticed an afghan in the front seat of the truck. They contacted the police after seeing the kidnapping story on the ten o'clock news and informed them of the location of the truck. When the police arrived at the church, the truck was gone.

The truck was found abandoned the next day in Kansas City, Missouri. A police dog that had been provided with some of Pamela's clothing was dispatched to Nelson's mother's house and alerted to an afghan found inside the residence. That

same day a large manhunt for Nelson commenced. On October 14, a civilian employee of a police department spotted Nelson hiding under a bridge. After he was spotted, Nelson went into the river and attempted to get away. When he made it back to shore, he was surrounded by railroad workers who detained him until the authorities arrived. After the authorities arrived, an onlooker shouted, "where is the little girl?" Nelson turned to an officer and stated, "I know where she's at, but I'm not saying right now." His capture was broadcast live on television. The next day the police found Butler's body in a wooded area behind the Grain Valley Christian Church. That discovery was broadcast on local television, and the United States Attorney held a live press conference from the discovery site. Subsequent investigation revealed that Pamela had been raped and then strangled to death with wire. The DNA in seminal fluid obtained from Pamela's underpants matched Nelson's DNA.

On October 21, 1999, a federal grand jury charged Nelson with (1) the kidnapping and unlawful interstate transportation of Butler for the purpose of sexual abuse which resulted in the death of the victim in violation of 18 U.S.C. § 1201(a)(1) and (g) and 18 U.S.C. § 3559(d) (1994); and (2) traveling across state lines with the intent to engage in a sex act with a female under the age of twelve which resulted in the death of the victim in violation of 18 U.S.C. §§ 2241(c), 2245, and 3559(d). Initially, Nelson entered a plea of not guilty. He then filed a motion for change of venue in January 2000. To test the venue, the court administered a thorough questionnaire to 538 potential jurors to compile data concerning potential juror bias. Because of the thoroughness of the survey and the large sample size, the court needed extra time to compile and consider the data. While the court was analyzing the data, Nelson's trial was continued several times. The court entered an order denying the motion for change of venue on March 9, 2001. At approximately the same time, Nelson's trial was rescheduled to commence on October 29, 2001.

4

On October 25, 2001, Nelson pleaded guilty to count one of the indictment, and the district court, upon the government's request and in accord with the plea agreement, dismissed count two of the indictment. Several days later, Nelson attempted suicide by ingesting a large amount of prescription medicine. He was treated at a local hospital, and the case then proceeded to the penalty phase of the trial in November 2001. The jury hearing the penalty phase returned a verdict that death should be imposed.

At sentencing, the district court offered the defendant the opportunity to address the court. Nelson, showing no remorse for what he had done, blistered the district court and the victim's family with a profanity laden tirade.

## II.

Nelson contends that the district court conducted a constitutionally deficient voir dire of the sentencing phase jury. Specifically, Nelson contends that he did not have enough time to ask the jurors enough follow-up questions concerning death penalty qualification, pretrial publicity, Nelson's attempted suicide, and other topics, including whether the jurors had relatives in law enforcement. Generally, "[t]he form and scope of voir dire rests primarily in the discretion of the district court." United States v. Granados, 117 F.3d 1089, 1092 (8th Cir. 1997). We thus review whether the district judge conducted voir dire in a way that protected Nelson's right to a fair and impartial jury only for an abuse of discretion. Id. "The district court abuses its discretion when the overall examination of the prospective jurors and the charge to the jury fails to protect [the] defendant from prejudice or fails to allow the defense to intelligently use its p[er]emptory challenges." Id.

The district court summoned a jury pool of over 600 persons. It had the jurors complete a thorough 94-question survey inquiring into the jurors' knowledge and

5

views of this case and their views on the death penalty. After receiving the responses and giving the parties time to process them, the district court held a conference during which the lawyers struck for cause over 200 members of the jury pool. Subsequently, during voir dire, the district court organized the remaining pool members into groups of approximately 50 jurors each. It read them the indictment, asked them if they knew the lawyers, introduced the case, explained death penalty procedure, and asked them if they could follow the procedure. See, e.g., Voir Dire Tr. at 8-22. The district court then divided each group into subpanels of eight or ten jurors. Once in the small groups, the district court conducted more questioning, addressing the crucial issue of whether the jurors would automatically vote for or against the death penalty, and it allowed the lawyers approximately twenty minutes each to ask follow up questions based on all of the responses. See, e.g., Voir Dire Tr. at 22-54. After questioning, the jurors were removed from the room, and the district court ruled on for-cause challenges to certain jurors. The district court repeated this process until it had twelve jurors and two alternates available.

In these circumstances, we cannot say that the district court conducted a constitutionally deficient voir dire and abused its discretion. The district court acted within its discretion in limiting counsel's ability to ask questions during voir dire. See United States v. Delay, 500 F.2d 1360, 1366 (8th Cir. 1974) (stating that where court allows counsel to conduct voir dire, it need not allow unlimited examination of an alleged area of prejudice). Where, as here, the jurors have announced their ability to be impartial and apply the law, we have previously concluded that the defendant had no right to make unlimited inquiry into every area of potential prejudice. See United States v. Lawrence, 952 F.2d 1034, 1037 (8th Cir.) (concluding that the district court did not abuse its discretion in refusing proposed voir dire questions about the credibility of law enforcement officers as witnesses where the court had already received response from juror that any connection he had to law enforcement would not influence his decision-making process), cert. denied, 503 U.S. 1011 (1992); United States v. Cassel, 668 F.2d 969, 971 (8th Cir.) (concluding that district court

did not conduct constitutionally deficient voir dire where it refused to inquire whether any of the jurors had relationships to law enforcement officers and whether any juror had been a victim of a crime), cert. denied, 457 U.S. 1132 (1982).

In addition, although the time for questioning was limited, extensive inquiry was not necessary because the follow-up question period merely supplemented the responses previously given in the exhaustive questionnaire and prior rounds of questioning. See Granados, 117 F.3d at 1092 (concluding that the district court's initial questioning supplemented by questions proposed by counsel from both sides adequately covered the areas of concern in selecting a fair and impartial jury). Moreover, as a factual matter, the district court allowed defense counsel to substantially exceed the twenty-minute time limitation. With respect to one small group, defense counsel used thirty minutes; with respect to two other small groups, defense counsel did not use up the allotted twenty minutes. Finally, the district court's questions were direct and succinct, giving Nelson's counsel a reasonable opportunity to quickly and easily detect and inquire into potential juror prejudice. See Ramsey v. Bowersox, 149 F.3d 749, 757 (8th Cir. 1998) (concluding that trial court did not err in declining to ask veniremen counsel's proposed questions where the district court's questions provided opportunity to detect bias), cert. denied, 525 U.S. 1166 (1999). We conclude that the district court conducted a constitutionally sufficient voir dire.

III.

Nelson argues that the district court erred in denying his motion for change of venue due to unduly prejudicial pretrial publicity. We review the denial of a motion for change of venue for an abuse of discretion. See United States v. Blom, 242 F.3d 799, 803 (8th Cir.), cert. denied, 534 U.S. 880 (2001).

When a change of venue is requested due to pretrial publicity, we engage in a two-tiered analysis. First, we must determine whether the pretrial publicity was "so extensive and corrupting" that we must presume "unfairness of constitutional magnitude" existed. Id. (quoted sources and internal marks omitted). We note that "the presumption of inherent prejudice is reserved for rare and extreme cases," id., and that a defendant "must satisfy a high threshold of proof in order to prove inherent prejudice," Pruett v. Norris, 153 F.3d 579, 585 (8th Cir. 1998). Second, if we were to determine that the pretrial publicity was not so corrupting as to warrant a presumption of unfairness, then we must look at the voir dire testimony of those who became trial jurors to determine if they "demonstrated such actual prejudice that it was an abuse of discretion to deny a timely change-of-venue motion." Blom, 242 F.3d at 803.

Nelson's kidnapping, rape, and murder of Butler garnered substantial media attention in the Kansas City area. In support of his motion for change of venue, Nelson attached 177 pages of exhibits demonstrating the magnitude of media coverage surrounding this case. See Appellant's App. at 24-200. Included is a report documenting the fact that 1037 television reports between October 12 and November 16, 1999, in the Kansas City area concerned the murder. Nelson also attached the text of all newspaper articles concerning the murder printed during this same time period. Nelson supplemented this motion on two occasions. See id. at 238-303. The supplements provided documentation of ongoing media coverage of the case.

The magistrate judge[3] did not immediately rule on the motion, but instead, as recited above, summoned a 538-person jury pool and had them complete a questionnaire concerning the amount of news concerning this case to which they had

---

[3]The Honorable Sarah W. Hays, United States Magistrate Judge for the Western District of Missouri.

been exposed and inquiring about their ability to set aside any impressions that they may have formed. After examining the results from the survey, the magistrate judge denied the motion. She concluded that the results of the questionnaire showed that pretrial publicity in this case did not warrant a presumption of inherent prejudice. She could not make a finding concerning actual prejudice, however, because Nelson's trial had been postponed and the jurors who answered the questionnaire were going to be relieved of duty and a new jury pool summoned prior to the new trial date.

Nelson appealed the denial of his motion to the district court. In a brief order, the district court affirmed the magistrate's order and denied the motion for change of venue. Subsequently, a jury pool of over 600 potential jurors was summoned for Nelson's scheduled trial. The district court submitted a questionnaire to the potential jurors inquiring into, among other things, the amount of publicity to which they had been exposed, their ability to set aside any impressions that they may have formed, and their views regarding the death penalty. Immediately prior to the scheduled trial date, Nelson pleaded guilty. He then moved for a change of venue with regard to the penalty phase portion of the proceedings. The district court denied the motion after conducting the penalty phase voir dire, noting that during the penalty phase voir dire, each juror stated that he or she could set aside any impression that he or she may have formed prior to trial and could base his or her judgment solely on the evidence presented. See id. at 1159.

Several considerations lead us to conclude that the presumption of unfairness is unwarranted here. First, much of Nelson's argument is more relevant to the guilt phase and less relevant to the penalty phase of the proceedings. For example, Nelson argues that "the FBI basically told the community that Keith Nelson was guilty." (Appellant's Br. at 17.) Citing a report from the Kansas City Star, Nelson argues that "the government told the community that Keith Nelson was guilty of this crime." (Id. at 18.) Later, quoting the testimony of his expert witness, Nelson argues that the news reports around the time of the incident implied that Nelson was guilty. (Id. at

9

23.) Other examples abound. See id. at 23-24 (summarizing testimony of his communications expert who concluded that statements from authoritative sources gave the strong impression that the government believed Nelson was guilty); id. at 35 (discussing statements from the victim's mother that there was evidence to prove Nelson's guilt); id. at 49 (noting that the extensive media coverage promoted a widespread belief in his guilt). Nelson pleaded guilty, however, and even if there was a widespread belief in his guilt sufficient to cast doubt on whether Nelson could have received a fair guilt phase trial, this does not necessarily mean that the penalty phase proceedings were suspect. Taken to its logical end, Nelson's argument would mean that a guilt phase jury which found a defendant guilty of a capital crime would be disqualified from determining a sentence because all of its members were convinced of the defendant's guilt.

Second, there was a two-year delay between the murder and the trial. The murder occurred on October 12, 1999, but the penalty phase trial did not start until November 2001. Generally, we have concluded that there should be no presumption of inherent unfairness where there has been a substantial delay between the criminal act and the trial. See United States v. Allee, 299 F.3d 996, 1000 (8th Cir. 2002) (concluding that one-year time span between the original press accounts of the crime and the trial eliminated the risk of presumed prejudice); Pruett, 153 F.3d at 586 (stating that 11-month delay between the crime and the trial dissipated the shock and hostility in the community); Snell v. Lockhart, 14 F.3d 1289, 1294 (8th Cir.) (noting salutary effect of two-year lag between criminal act and trial), cert. denied, 513 U.S. 960 (1994). This conclusion is buttressed by the government's evidence showing that after Nelson's arrest and Butler's funeral, media coverage decreased significantly to the point of vanishing. See Appellee's App. at 45-103; see also Swindler v. Lockhart, 885 F.2d 1342, 1348 (8th Cir. 1989) (concluding that significant fact in finding no inherent prejudice was two-year lag between crime and trial coupled with fact that media attention had significantly decreased), cert. denied, 495 U.S. 911 (1990); Simmons v. Lockhart, 814 F.2d 504, 510 (8th Cir. 1987) (concluding that seven-

month lag between event and trial "may be long enough to allow the initial heat and hostility to dissipate, particularly when the local press had not kept the story in the forefront of public attention"), cert. denied, 485 U.S. 1015 (1988).

We also find significant the fact that the results from the questionnaire submitted to the first jury pool showed that only 29% of those jurors had formed strong or fixed opinions about the case. (Appellee's App. at 145.) This court has found the presumption of partiality not warranted where questionnaires revealed similar or higher percentages of bias. See Pruett, 153 F.3d at 586 n.9 (concluding that pretrial publicity was not so pervasive and unrelenting as to constitute prejudice where 29% of jury pool acknowledged that they could not be impartial); Simmons, 814 F.2d at 510 (concluding that fact that only 25% of jury pool had formed opinion that defendant was guilty belied fact that pretrial publicity had so corrupted local attitudes that defendant could not be fairly tried); United States v. Faul, 748 F.2d 1204, 1213 (8th Cir. 1984) (concluding that even where 50% of jury pool indicated partiality, this did not necessarily support conclusion that pretrial publicity rendered the defendant's trial inherently unfair, especially where, as here, the court took extra precautions in preventing partiality such as enlarging the jury pool), cert. denied, 472 U.S. 1027 (1985).

Accordingly, we conclude that the presumption of unfairness does not attach here and that the district court did not abuse its discretion in denying the motion on that ground.

Nelson makes no argument concerning actual unfairness. After careful review of the responses of the penalty phase jurors to the questionnaire and the voir dire transcript, we are of the view that the district court did not abuse its discretion in denying the motion for change of venue on this ground either. Each juror indicated that he or she could act impartially. In addition, the district court took significant precautions to ensure that the penalty phase jury was impartial.

11

## IV.

Nelson argues that the district court unconstitutionally denied his for-cause challenges to jurors 21, 38, 114, and 116. Nelson used peremptory challenges to strike each of these jurors and thereby prevented them from sitting on the penalty phase jury. As such, Nelson's argument has no merit. See United States v. Martinez-Salazar, 528 U.S. 304, 307 (2000) (holding that where the district court erroneously fails to remove a juror for cause, "that if the defendant elects to cure such an error by exercising a peremptory challenge, and is subsequently convicted by a jury on which no biased juror sat, he has not been deprived of any rule-based or constitutional right"); United States v. Paul, 217 F.3d 989, 1004 (8th Cir. 2000) (concluding under similar facts that the right to exercise peremptory challenges was not impaired and that the Sixth Amendment right to fair trial is not violated because the venirepersons did not serve on the petit jury), cert. denied, 534 U.S. 829 (2001).

## V.

Nelson argues that the district court unconstitutionally denied his for-cause challenge to juror 141 and unconstitutionally granted the government's for-cause challenges to venirepersons 33, 122, and 124. As a general rule, "'a juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" United States v. Ortiz, 315 F.3d 873, 892 (8th Cir. 2002) (quoting Adams v. Texas, 448 U.S. 38, 45 (1980)), petition for cert. filed (June 10, 2003) (No. 02-11188). "Moreover, bias does not have to be evident from voir dire with unmistakable clarity because many veniremen simply cannot be asked enough questions to reach the point where their bias has been made unmistakably clear." Id. (internal quotations and citation omitted). Thus, we must afford substantial deference to the district court and affirm its judgment where the

12

decision is fairly supported by the record. See Swindler, 885 F.2d at 1345 ("[T]he question whether a venireman is biased has traditionally been determined through voir dire culminating in a finding by the trial judge concerning the venireman's state of mind. . . . [S]uch a finding is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province. Such determinations [are] entitled to deference. . . . " (quoting Wainwright v. Witt, 469 U.S. 412, 428-29 (1985))). "Because the trial judge is in the best position to analyze the demeanor and credibility of a venireman, we will not reverse a court's ruling absent an abuse of discretion." Ortiz, 315 F.3d at 888.

## A.  Juror 141

Nelson argues that juror 141's responses to the questionnaire and during voir dire show that she could not be impartial and that she should have been removed for cause.  The voir dire transcript shows, however, that juror 141 stated that she could act impartially.  See Voir Dire Tr. at 310 (stating that it was a fair statement that she would not impose the death penalty in every case); id. at 310 (stating that she could perform the process of weighing the aggravators and mitigators and base her decision solely on the evidence presented); id. (stating that she had no preconceived notion how the case should turn out); id. at 328 (stating that based on the evidence she could "go either way" and make a fair judgment); id. at 330 (stating that she could put aside anything she had heard or read and make a fair judgment based on the evidence presented).  We reiterate that:

> [t]he question whether a jury was actually impartial is plainly one of
> historical fact: did a juror swear that he could set aside any opinion he
> might hold and decide the case on the evidence, and should the juror's
> protestation of impartiality have been believed.  Because a
> determination of this kind is essentially one of credibility, and therefore
> largely one of demeanor, the trial court's resolution of the question is

13

entitled to special deference and may be overturned only for manifest error.

Pruett, 153 F.3d at 587 (internal quotations and citations omitted); see also United States v. Moore, 149 F.3d 773, 780 (8th Cir. 1998) (concluding that district court's credibility determination concerning juror partiality "cannot be manifest error; indeed it is virtually unassailable on appeal"), cert. denied, 525 U.S. 1030 (1998) and 525 U.S. 1082 (1999).

In light of these standards, we cannot conclude that the district court committed reversible error in failing to strike Juror 141. See Ortiz, 315 F.3d at 895 (holding that district court did not abuse its discretion in failing to strike certain jurors for cause after those jurors initially expressed the opinion that they were in favor of imposing the death penalty in all cases of premeditated murder but who then later stated that they could perform the process of looking at aggravating and mitigating factors and impose a sentence of life imprisonment); Allee, 299 F.3d at 1001 (concluding that jury was impartial and fair where jurors asserted that they would decide the case only on the evidence presented).

## B. Jurors 33, 122, and 124

Nelson argues that the district court erred in granting the government's for-cause challenges to venirepersons 33, 122, and 124. The relevant question is whether the district court committed manifest error in determining that these three venirepersons' views concerning the death penalty would have substantially impaired their ability to abide by their oath. After careful review of their questionnaire answers and the voir dire transcript, we conclude that the district court did not commit manifest error.

At a minimum, the record reveals that each of the three venirepersons would have had a great reluctance if not an actual inability to vote in favor of imposing the

14

death penalty. Their strong responses against the death penalty in the jury questionnaires in combination with their equivocal responses given during voir dire provide fair support for the district court's decision. See Moore, 149 F.3d at 780 (holding that the district court did not err in striking prospective jurors who expressed reservations about imposing the death penalty on the grounds that the record fairly supported the district court's decision and the district court was afforded deference on this issue even where there was other testimony showing that the prospective jurors could follow the law); Antwine v. Delo, 54 F.3d 1357, 1369 (8th Cir. 1995) (stating that where prospective juror's position on imposing the death penalty is ambiguous, the court could resolve the ambiguity in the government's favor given the trial court's superior position for assessing the potential juror's demeanor and credibility), cert. denied, 516 U.S. 1067 (1996).

## VI.

Nelson argues that Penalty Phase Instructions Nos. 1 and 22 did not fairly and accurately state the applicable law. Instruction No. 1 stated that:

> [i]f you unanimously find that the aggravating factor or factors which you all found to exist sufficiently outweigh any mitigating factor or factors which any of you found to exist to justify imposition of a sentence of death, or, if, in the absence of a mitigating factor or factors, you find that the aggravating factor or factors alone are sufficient to justify imposition of a sentence of death, the law provides that the defendant shall be sentenced to death.

(Appellee's App. at 265.) Instruction No. 22 stated that:

> [i]f you unanimously conclude that the aggravating factor or factors found to exist sufficiently outweigh any mitigating factor or factors found to exist to justify a sentence of death, or in the absence of any mitigating factors, that the aggravating factor or factors alone are

15

sufficient to justify a sentence of death, you shall record your determination that death is justified in Section VI(a), on Page 8 of the Special Verdict Form.

(Id. at 298.)

Nelson contends that the use of the mandatory-type word "shall" was error and that the district court should have given his proffered instruction which stated only that the jury "may" impose the death penalty. (Appellant's App. at 1164.) Whatever merit Nelson's arguments may have in a vacuum, prior decisions of this court demand that they be rejected. See Ortiz, 315 F.3d at 900-901 (rejecting the same argument and concluding that use of the word "shall" in an instruction nearly identical to Penalty Phase Instruction No. 1 was a proper statement of the law under the Federal Death Penalty Act); United States v. Allen, 247 F.3d 741, 780-81 (8th Cir. 2001) (rejecting the same argument and concluding that use of the word "shall" in an instruction nearly identical to Penalty Phase Instruction No. 22 was a proper statement of the law under the FDPA), vacated and remanded on other grounds, 536 U.S. 953 (2002). Accordingly, the district court did not err in giving to the jury Penalty Phase Instructions Nos. 1 and 22.

VII.

Nelson next contends that the district court erred in admitting certain victim impact evidence. Six victim impact witnesses testified at trial: Penny Butler, the victim's sister; Casey Eaton, the victim's sister; Jenna Fries, a neighbor and classmate of the victim; Holly Woods, a neighbor and friend of the victim; Cherri West, the victim's mother; and Terrell Yadrich, the victim's teacher. A fair summation of their collective testimony is that the witnesses provided emotional and, on occasion, tearful testimony about Pamela and the impact of her murder on their lives. See Trial Tr. at 169-203, 531-578. They testified that Pamela was a loving, playful, and energetic

16

girl; that she was a good student; and that she was an ambitious girl with big dreams. During Penny's testimony, two pictures of Penny and Pamela riding their bicycles were admitted into evidence. During Casey's testimony, three letters written by Casey concerning the kidnapping and murder were admitted into evidence. See Appellant's Add. at 7-11. A tearful Casey read the first letter to the jury, but because she was unable to compose herself and continue, the district court had the government read the remaining letters to the jury. Several other letters and photographs were admitted into evidence. Nelson argues that this evidence was highly emotional, cumulative, and unduly prejudicial.

We reject Nelson's argument. "[I]t is clear from both the FDPA and Supreme Court precedent that the government is allowed to present and a jury is allowed to consider victim impact evidence in reaching its sentencing decision in a capital case." Allen, 247 F.3d at 778; see 18 U.S.C. § 3593(a) and (c) (2000) (stating that the government may present any evidence relevant to any aggravating factor listed in the notice of intent to seek the death penalty which "may include factors concerning the effect of the offense on the victim and the victim's family, and may include oral testimony, a victim impact statement that identifies the victim of the offense and the extent and scope of the injury and loss suffered by the victim and the victim's family"); Payne v. Tenn., 501 U.S. 808, 827 (1991) (holding that the Eighth Amendment does not erect a per se bar to the admission of victim impact evidence). The defendant's due process rights can be infringed, however, where the victim impact evidence introduced is "so unduly prejudicial that it renders the trial fundamentally unfair." Payne, 501 U.S. at 825.

Quantitatively, the victim impact evidence introduced in this case is not significantly more than what we concluded was permissible in Allen. In this case, six victim impact witnesses testified, and their testimony comprised approximately 101 of the more than 1100 pages of trial transcript. Cf. Allen, 247 F.3d at 779 (concluding that no undue prejudice existed where eleven witnesses, including the

17

victim's mother, sister, brother, three coworkers, former spouse, three sons, and widow testified and that testimony comprised 88 pages of transcript). In addition, the potential for undue prejudice was mitigated here because Nelson presented substantial evidence on his own behalf, including the testimony of Mark Cunningham, a psychologist; Nancy Nelson, his mother; Kenneth and Steven Nelson, his brothers; Mary Smith, his aunt; Georganna Romero, his aunt; Ellen Crutsinger, a former teacher; Homer Dear, his former principal; Irene Wood, an acquaintance; Melvin Lister, a correctional officer; David Cunningham, his former employer; Rhonda and Jennifer Monroe, his former babysitter and her daughter, respectively; Gene Thompson, his former landlord; and Michael Griffith, his former neighbor. See Paul, 217 F.3d at 1002 (noting that fact that defendant's mother presented mitigating evidence supported finding that admission of victim impact evidence was not constitutional error).

Qualitatively, the nature and scope of the victim impact evidence in this case is not meaningfully different than that allowed in Payne and decisions of this court. See Payne, 501 U.S. at 814-15 (quoting testimony of grandmother stating that her grandson, the victim's son, "cries for his mom . . . and . . . sister"); Simmons v. Bowersox, 235 F.3d 1124, 1134 n.4 (8th Cir.) (summarizing testimony of victim impact witnesses including the victim's spouse and daughter who testified as to what the victim might have experienced during her last remaining minutes before the murder and the victim's sister who read a prayer during her testimony), cert. denied, 534 U.S. 924 (2001). The testimony at issue here falls within the same broad categories of testimony approved in the above cited cases: victim character evidence, emotional impact of loss, and religious references. In the circumstances of this case, we cannot say that the quantity or quality of victim impact evidence rendered Nelson's penalty phase trial fundamentally unfair.

## VIII.

For the reasons stated above, we affirm the judgment of the district court.

BRIGHT, Circuit Judge.

I concur in the result.

_____